# EXHIBIT A

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of January 31, 2023 ("**Effective Date**"), by and among Phoenix Wine Company, LLC, a California limited liability company (the "**Company**"), Cameron Hughes, an individual residing in California ("**Hughes**" or "**Seller**"), and Martin Ray Winery, Inc., a California corporation (the "**Buyer**").

## RECITALS

A.      Hughes owns 100.00% of the issued and outstanding membership interests of the Company (the "**Interest**").

B.      The Buyer desires to purchase Fifty-One percent (51.00%) of the Interest ("**Majority Interest**") from Seller at Closing, and Seller desires to sell the Majority Interest to Buyer at Closing, subject to the terms and conditions set forth in this Agreement.

C.      Concurrently herewith Hughes and Buyer shall form a new manager managed limited liability company Eleveur LLC, which shall own the trademark "Eleveur de Negoce" (the "**Trademark**"), which Trademark Eleveur LLC shall license to the Company for the development, production, and sale of wine under the brand name "Eleveur" ("**Concurrent Transactions**") pursuant to that certain alternating proprietorship/production agreement between the Company and Buyer as more particularly described herein.

D.      Concurrently with the closing of the contemplated transaction, Hughes shall enter into a consulting agreement with the Company (the "**Hughes Consulting Agreement**") in the form contemplated herein.

In consideration of the foregoing, the representations, warranties, covenants and agreements set forth in this Agreement, and other good and valuable consideration, the adequacy and receipt of which hereby are acknowledged, the parties hereby agree as follows:

## DEFINED TERMS

For purposes of this Agreement, the following terms, when used in this Agreement, shall have the meanings assigned to them as follows:

"**ABC**" shall have the meaning given in <u>Section 6.05(a)</u>.

"**Actions**" means any action, suit, claim, arbitration, grievance, complaint, notice of violation, consent decree, order, charge, proceeding, opposition, audit, or investigation commenced, filed or brought before or otherwise involving a Government Agency.

"**Affiliate**" of any Person means any person directly or indirectly controlling, controlled by, or under common control with, any such Person and any officer, director or controlling person of such Person. The term "Affiliate" also includes any direct family member of such Person who is a natural person.

"**Agreement**" shall have the meaning given in the preamble.

"**Amended Operating Agreement**" shall mean that certain First Amended and Fully Restated Operating Agreement of Phoenix Wine Company, LLC dated as of the Closing Date.

"**Ancillary Documents**" means all other agreements, documents, instruments and/or certificates contemplated by this Agreement to be executed in connection with the transactions contemplated hereby.

"**Articles**" shall have the meaning given in Section 3.02(a).

"**Basket**" shall have the meaning given in Section 9.05(a).

"**Benefit Plan**" means any plan, program, contract, policy or arrangement providing for compensation, bonus, incentive, 401(k), retirement, pension, profit-sharing, deferred compensation, severance, termination pay, performance awards, stock or stock-related awards, unit or unit-related awards, fringe benefits, other employee benefits or any other employee benefit plan, program, contract, policy or arrangement of any kind, whether formal or informal, funded or unfunded, written or oral, including, but not limited to, any "employee benefit plan" within the meaning of Section 3(3) of ERISA, or any trust, escrow, or similar agreement related thereto, whether or not funded, in respect of any present or former employees, directors, members, officers, shareholders, unitholders, consultants or independent contractors of the Company.

"**Business Days**" means any day when banks are open for business in California.

"**Buyer**" shall have the meaning given in the preamble.

"**Buyer Group**" shall have the meaning given in Section 9.05(a).

"**Buyer Indemnitee**" shall have the meaning given in Section 9.01(a).

"**CAP**" shall have the meaning given in Section 9.05(a).

"**Cash**" means, as of the Closing Time, all cash, certificates of deposit, bank deposits, negotiable instruments, marketable securities and other cash equivalents of the Company, including deposits for the account of the Company and excluding issued but uncleared checks and restricted cash, in each case determined in accordance with the Working Capital Accounting Principles.

"**Change in Control Applications**" shall have the meaning given in Section 6.05(a).

"**Claim**" shall have the meaning given in Section 9.02.

"**Claim Notice**" shall have the meaning given in Section 9.02.

"**Closing**" shall have the meaning given in Section 1.04.

"**Closing Balance Sheet**" shall have the meaning given in Section 1.05(c).

"**Closing Date**" shall have the meaning given in <u>Section 1.04</u>.

"**Closing Time**" shall have the meaning given in <u>Section 1.04</u>.

"**Closing Working Capital**" shall have the meaning given in <u>Section 1.05(c)</u>.

"**Code**" means the Internal Revenue Code of 1986, as most recently amended.

"**Company**" shall have the meaning given in the preamble.

"**Company Employees**" shall have the meaning given in <u>Section 3.19</u>.

"**Company Intellectual Property**" means all Intellectual Property that is owned by the Company.

"**Company IP Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used or is necessary for the conduct of the Company's business as currently conducted to which the Company is a party, beneficiary or otherwise bound.

"**Company IP Registrations**" means all Company Intellectual Property that is subject to any issuance, registration, application or other filing by, to or with any Government Agency or authorized private registrar in any jurisdiction, including registered trademarks, domain names and copyrights, issued and reissued patents and pending applications.

"**Company's Knowledge**" means the actual knowledge of Hughes after reasonable inquiry of direct reports and third parties who would most likely have information related to a specific subject matter.

"**Concurrent Transactions**" shall have the meaning given in <u>Recital C</u>.

"**Contract**" means all written contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, and all other agreements and legally binding arrangements.

"**Current Balance Sheet**" shall have the meaning given in <u>Section 1.05(c)</u>.

"**Damages**" shall have the meaning given in <u>Section 9.01(a)</u>.

"**Data Room**" shall have the meaning given in the introduction to <u>Article 3</u>.

"**Disclosure Schedule**" shall have the meaning given in the introduction to <u>Article 2</u>.

"**Due Diligence Checklist**" shall have the meaning given in the introduction to <u>Article 3</u>.

"**Effective Date**" shall have the meaning given in the preamble.

"**Eleveur LLC**" shall have the meaning given in <u>Section 6.02</u>.

"**Eleveur Operating Agreement**" shall mean that certain operating agreement entered into between Buyer and Seller as of Closing Date regarding governance of Eleveur LLC, which shall be substantially in the form of the Amended Operating Agreement of the Company.

"**Email List Serve**" shall mean all customers of the Company who are presently opted-in to receive notifications from the Company by electronic mail regarding Company product offerings, including but not limited to, offerings of wine futures purchases.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Estimated Closing Balance Sheet**" shall have the meaning given in Section 1.05(b).

"**Estimated Closing Working Capital**" shall have the meaning given in Section 1.05(b).

"**Estimated Purchase Price Statement**" shall have the meaning given in Section 1.03(a).

"**Final Purchase Price**" shall have the meaning given in Section 1.02(c).

"**Final WC Adjustment**" shall have the meaning given in Section 1.05(e).

"**Financial Statements**" shall have the meaning given in Section 3.05(a).

"**Fiscal Year**" shall for each calendar year begin on January 1 and end on December 31.

"**Fulfillment Holdback**" shall have the meaning given in Section 1.06(a).

"**Fulfillment Holdback Formula**" shall have the meaning given in Section 1.06(a).

"**Fulfillment Holdback Value**" shall have the meaning given in Section 1.06(b).

"**Fundamental Representations**" shall have the meaning given in Section 9.05(a).

"**GAAP**" means generally accepted accounting principles in the United States as of the date hereof.

"**Gift Card Liabilities**" shall have the meaning given in the definition of Working Capital.

"**Governing Documents**" shall have the meaning given in Section 3.02(a).

"**Government Agency**" means any Federal, state or local government or any foreign, national, provincial or local government, or any governmental, regulatory, legislative, executive or administrative authority, agency or commission, or any court, arbitrator, tribunal, or judicial body.

"**Held Back Inventory**" shall mean that certain inventory identified in Exhibit J with a cost-basis of Two Hundred Eighty Eight Thousand Six Hundred Thirty Five and No/100 Dollars ($288,635.00).

"**Holdback**" shall have the meaning given in Section 1.06(a).

DocuSign Envelope ID: 0755C7A4-73B1-41D6-9C37-8E54E1630D65

"**Holdback Period**" shall have the meaning given in <u>Section 1.06(a)</u>.

"**Hughes**" shall have the meaning given in the preamble.

"**Hughes Consulting Agreement**" shall have the meaning given in <u>Recital D</u>.

"**Hughes Persona**" shall have the meaning given in <u>Section 9.01(a)(v)</u>.

"**Income Tax Assets**" means all income taxes (including any tax on or based upon net income, gross income, or income as specially defined, or earnings, profits, or selected items of income, earnings or profits) paid in excess of amount owed.

"**Income Tax Liabilities**" means all income taxes (including any tax on or based upon net income, gross income, or income as specially defined, or earnings, profits, or selected items of income, earnings or profits) owed in excess of amount paid.

"**Indebtedness**" means, with respect to the Company, (i) (A) all obligations for borrowed money, (B) all obligations evidenced by bonds, debentures, notes or other similar instruments, (C) all obligations in respect of letters of credit, to the extent drawn, and bankers' acceptances issued for the account of the Company, (D) all obligations for the payment of money relating to leases that are required to be classified as a capitalized lease obligation in accordance with GAAP; (E) all obligations for all or any part of the deferred purchase price of property or services (other than outstanding trade payables less than sixty (60) days past due), or (F) all obligations under interest rate swap, hedging or similar agreement, and (G) all obligations under interest rate swap, hedging or similar agreements, or (ii) any liability of others described in the preceding clause (i) that the Company has guaranteed, that is recourse to the Company or any of its assets or that is otherwise its legal liability or that is secured in whole or in part by the assets of the Company.  For the avoidance of doubt, no obligations or expenses included in the calculation of Working Capital shall constitute Indebtedness.

"**Indemnified Party**" shall have the meaning given in <u>Section 9.02</u>.

"**Indemnifying Party**" shall have the meaning given in <u>Section 9.02</u>.

"**Initial Purchase Price**" shall have the meaning given in <u>Section 1.02(b)</u>.

"**Initial WC Adjustment**" shall have the meaning given in <u>Section 1.05(b)</u>.

"**Insurance Policies**" shall have the meaning given in <u>Section 3.15</u>.

"**Intellectual Property**" means all intellectual property rights and assets, and all rights, interests and protections that are associated with, similar to, or required for the exercise of, any of the foregoing, however arising, pursuant to the Laws of any jurisdiction throughout the world, whether registered or unregistered, including any and all: (a) trademarks, service marks, trade names, brand names, logos, trade dress, design rights and other similar designations of source, sponsorship, association or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications and renewals for, any of the foregoing; (b) internet domain names, whether or not trademarks, registered in any top-level domain by any

authorized private registrar or Government Agency, web addresses, web pages, websites and related content, accounts with Twitter, Facebook and other social media companies and the content found thereon and related thereto, and URLs; (c) works of authorship, expressions, designs and design registrations, whether or not publishable or copyrightable, including copyrights, author, performer, moral and neighboring rights, and all registrations, applications for registration, and renewals of such copyrights; (d) inventions, discoveries, trade secrets, including but not limited to recipes and formulas related to wine produced by the Company, business and technical information and know-how, databases, data collections and other confidential and proprietary information and all rights therein; (e) patents (including all reissues, divisionals, provisionals, continuations and continuations-in-part, re-examinations, renewals, substitutions and extensions thereof), patent applications, and other patent rights and any other Government Agency-issued indicia of invention ownership (including inventor's certificates, petty patents and patent utility models); (f) rights of publicity existing at common law or pursuant to any statute or regulation, including the right to use someone's name; (g) software and firmware, including data files, source code, object code, application programming interfaces, architecture, files, records, schematics, computerized databases and other related specifications and documentation; (h) excluding off-the-shelf software; (i) royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing; and (j) all rights to any Actions of any nature available to or being pursued by Seller or the Company to the extent related to the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"**Intellectual Property Rights**" shall have the meaning given in Section 3.11.

"**Intended Tax Treatment**" shall have the meaning given in Section 1.08.

"**Interest**" shall have the meaning given in Recital A.

"**Interim Balance Sheet**" shall have the meaning given in Section 3.05(a).

"**Interim Financial Statements**" shall have the meaning given in Section 3.05(a).

"**Inventory Holdback**" shall have the meaning given in Section 1.06(a).

"**Inventory Holdback Bonus**" shall have the meaning given in Section 1.06(d).

"**Inventory Holdback Statement**" shall have the meaning given in Section 1.06(c).

"**Inventory Holdback Value**" shall have the meaning given in Section 1.06(c).

"**Law**" means any judgment, order, decree, statute, law, ordinance, ruling, regulation, writ or injunction of any Government Agency.

"**Lendspark Agreement**" has the meaning given in Section 3.05(b) of the Disclosure Schedule.

"**Lien**" means any mortgage, deed of trust, pledge, security interest, equitable interest, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership, encumbrance, lien, charge, covenant, condition or restriction, adverse claim, preference, transfer restriction (other than restrictions under federal or state securities laws), Tax (except for those Taxes that are recurring and not yet delinquent).

"**Majority Interest**" shall have the meaning given in Recital B.

"**Material Consents**" shall have the meaning given in Section 6.07.

"**Material Contracts**" shall have the meaning given in Section 3.12.

"**Material Permits**" shall have the meaning given in Section 3.14.

"**Material Suppliers**" shall have the meaning given in Section 3.23(c).

"**Membership Unit Assignment Agreement**" shall have the meaning given in Section 7.01.

"**Name and Likeness Agreement**" shall have the meaning given in Section 7.01.

"**Neutral Accountant**" shall have the meaning given in Section 1.05(d).

"**Neutral Determination**" shall have the meaning given in Section 1.05(d).

"**Neutral PPA**" shall have the meaning given in Section 1.07(b).

"**New Fulfillment Contract**" shall have the meaning given in Section 1.06(b).

"**Non-Compete**" shall have the meaning set forth in Section 6.08.

"**Operating Agreement**" shall have the meaning given in Section 3.02(a).

"**Parties**" shall mean, collectively, the Buyer and the Seller.

"**Permits**" shall have the meaning given in Section 3.14.

"**Permitted Liens**" means (a) statutory Liens for current Taxes, assessments or governmental charges or levies not yet due and payable or delinquent and being diligently contested in good faith so long as adequate reserves have been established by the Company, and (b) statutory Liens of carriers, warehousemen, mechanics, materialmen and the like arising in the ordinary course of business and for obligations not yet due and payable if the underlying obligations are not delinquent and so long as such Liens are not resulting from a material breach, default or violation by the Company of any Contract or Law.

"**Person**" means any natural person, partnership (whether general or limited), limited liability company, corporation, association, members of joint venture entities or any other entity.

"**Purchase Price**" shall have the meaning given in <u>Section 1.02</u>.

"**Purchase Price Allocation**" shall have the meaning given in <u>Section 1.07(a)</u>.

"**Purchase Price Allocation Agreement**" shall have the meaning given in <u>Section 1.07(a)</u>.

"**Restricted Period**" means the period beginning on the Effective Date and ending on the date which is eighteen (18) months after termination or expiration of the Hughes Consulting Agreement for any reason, whichever is earlier.

"**RFP**" shall have the meaning given in <u>Section 1.06(b)</u>.

"**Royalty**" shall have the meaning given in <u>Section 6.02</u>.

"**Sale of Majority Interest**" means the transactions contemplated hereby.

"**Seller**" shall have the meaning given in the preamble.

"**Seller Broker Expense**" shall have the meaning given in <u>Section 3.25</u>.

"**Seller Indemnitee**" shall have the meaning given in <u>Section 9.01(c)</u>.

"**Seller's Knowledge**" means the actual knowledge of Hughes.

"**Shopify Capital Agreement**" has the meaning given in <u>Section 3.05(b)</u> of the Disclosure Schedule.

"**SMS List Serve**" shall mean all customers of the Company who are presently opted-in to receive notifications from the Company by text message regarding Company product offerings, including but not limited to offerings of wine futures purchases.

"**Target Area**" means the geographic area consisting of the areas in which the Company actively conducts business in, including but not limited to the United States of America, Europe, and Australia.

"**Targeted Closing Working Capital**" has the meaning given in <u>Section 1.05(c)</u>.

"**Tax**" (and, in the plural, "**Taxes**") means any federal, state, local, or non-U.S. income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"**Tax Return**" means any report, return, election, claim for refund or information return or statement with respect to Taxes, including any schedule or attachment thereto and any amendment thereof.

"**Third-Party Claim**" shall have the meaning given in <u>Section 9.04</u>.

"**Trademark**" shall have the meaning given in <u>Recital C</u>.

"**Trademark Assignment Agreement**" shall have the meaning given in <u>Section 7.03</u>.

"**Trademark License**" shall have the meaning given in <u>Section 6.02</u>.

"**Trademark License Agreement**" shall have the meaning given in <u>Section 6.02</u>.

"**Treasury**" shall mean the Treasury Department of the United States of America, including without limitation, the Internal Revenue Service or "**IRS**".

"**TTB**" means the Alcohol and Tobacco Tax and Trade Bureau, United States Department of the Treasury.

"**Variable Amount**" shall have the meaning given in <u>Section 1.06</u>.

"**WC Adjustment**" means the adjustment of the Purchase Price as determined in accordance with <u>Section 1.05(a)</u>.

"**Wine Business**" shall mean any company whose business or proposed business in any way involves or relates to creating, developing, designing, distributing, producing, advertising, promoting, marketing or selling wine products or wine brands in a manner that is similar to, or directly competes, with Company; provided, however, this definition shall exclude Eleveur LLC.

"**Working Capital**" means, as of the Closing Time, with respect to the Company, the aggregate value (expressed as a positive or negative number) of the current assets of the Company (including accounts receivable, other current assets, inventory, prepaid insurance, and prepaid property taxes, but excluding Cash) minus the current liabilities of the Company (including accounts payable, sales tax payable, sales tax liabilities, payroll liabilities, FICA, Medicare, State withholdings, Federal withholdings, workmen's compensation, and "**Gift Card Liabilities**" in the amount of Sixty Eight Thousand Nine Hundred Fourteen 47/100 Dollars ($68,914.47.00)  as identified in the Interim Balance Sheet; but excluding short debts such as Lendspark Agreement, Shopify Capital Agreement, and credit card debt), in each case, calculated in accordance with the Working Capital Accounting Principles, provided, that Working Capital shall exclude (i) any items to the extent they are taken into account in the calculation of Cash, Transaction Expenses, and (ii) all Income Tax Assets and all Income Tax Liabilities, all as determined in accordance with the Working Capital Accounting Principles.

"**Working Capital Accounting Principles**" means the accounting principles to be used to compute the Estimated Working Capital and the Final Working Capital pursuant to <u>Section 1.05</u>, as set forth on <u>Exhibit A</u> hereto and illustrated in the example attached thereto.

<u>Exhibits and Schedules</u>

Exhibit A – Working Capital Accounting Principles

Exhibit B – Amended Operating Agreement

Exhibit C – Trademark License Agreement

Exhibit D – Membership Unit Assignment Agreement

Exhibit E – Eleveur Operating Agreement

Exhibit F – Hughes Consulting Agreement

Exhibit G – Trademark Assignment Agreement

Exhibit H – Held Back Inventory

Exhibit I – Name and Likeness Agreement

Exhibit J – Disclosure Schedule

**ARTICLE 1.**
**PURCHASE AND SALE**

**Section 1.01    Purchase and Sale of the Majority Interest**. At the Closing, subject to the terms and conditions set forth in this Agreement, the Seller agrees to sell, assign, convey and deliver to the Buyer, and the Buyer agrees to purchase, acquire and accept from Seller, all right, title and interest in and to the Majority Interest, free and clear of any Liens.

**Section 1.02    Purchase Price**.

(a)    The aggregate consideration for the Majority Interest (the "**Purchase Price**") shall be equal to:

(i)    a base amount of Ten Million Six Hundred Forty-Eight Thousand Dollars ($10,648,000);

(ii)    plus any Cash;

(iii)    less any Indebtedness;

(iv)    plus the amount of the WC Adjustment if it is positive, or minus the amount of the WC Adjustment if it is negative.

(b)    The "**Initial Purchase Price**" shall be equal to the Purchase Price as determined pursuant to Section 1.03(a) and shall be payable as set forth in Section 1.03(b).

(c)    The Initial Purchase Price as adjusted pursuant to Article 1 herein shall be referred to as the "**Final Purchase Price**".

**Section 1.03    Payments at Closing**.

(a)    At least three (3) Business Days prior to the Closing Date, Seller shall deliver to the Buyer a written statement prepared in good faith setting out the Seller's estimate of (i) Indebtedness, (ii) the Initial WC Adjustment (as defined in Section 1.05(b)), and (iii) the resulting Initial Purchase Price, each as estimated to be such respective amount as at the Closing

10

DocuSign Envelope ID: 0755C7A4-73B1-41D6-9637-3EF451630D65

Time (and without giving effect to the transactions contemplated herein), based on books, records and other applicable information available with regard to such calculations, together with all necessary supporting documents (the "**Estimated Purchase Price Statement**").

(b)    At Closing, the Buyer shall pay the Initial Purchase Price in cash, less the value of the Holdback set forth in Section 1.06 below.

**Section 1.04    Closing**. The closing (the "**Closing**") of the transactions contemplated herein will take place on the date hereof (the "**Closing Date**"), at the offices of Carle, Mackie, Power and Ross LLP, 100 B Street, Suite 400, Santa Rosa, CA 95401, unless another date or place is agreed to in writing by the Buyer and the Seller. For Tax, accounting and other computational purposes, the Closing shall be deemed to have occurred as of 12:01am (Pacific Standard Time) on the Closing Date (the "**Closing Time**").

**Section 1.05    Working Capital Adjustment**.

(a)    The "**WC Adjustment**" shall be determined in accordance with this Section 1.05, and is referred to as the Initial WC Adjustment for purposes of the Initial Purchase Price and Final WC Adjustment for purposes of the Final Purchase Price.

(b)    Within five (5) days prior to the Closing Date, the Seller shall prepare and deliver to the Buyer an estimated balance sheet of the Company as of the Closing Time (as the same may be adjusted in accordance with this subsection, the ("**Estimated Closing Balance Sheet**") which Estimated Closing Balance Sheet will be prepared in a manner consistent with the Interim Balance Sheet (as defined below), together with its calculation of Estimated Closing Working Capital.  The term "**Initial WC Adjustment**" means the amount of Estimated Closing Working Capital calculated in accordance with the Working Capital Accounting Principles, and, to the extent not inconsistent with the Working Capital Accounting Principles, the same accounting methods, policies, practices and procedures, with consistent classifications and estimation methodologies, as were used in the preparation of the balance sheet included in the Company's 2022 Financial Statements (the "**Interim Balance Sheet**"). The term "**Estimated Closing Working Capital**" means the estimated amount of Working Capital of the Company as of the Closing Time, calculated in accordance with this Section 1.05(b).

(c)    Within ninety (90) days after the Closing Date, the Buyer shall prepare and deliver to the Seller a balance sheet of the Company as of the Closing Time (as the same may be adjusted in accordance with this subsection, the "**Closing Balance Sheet**") which Closing Balance Sheet will be prepared in a manner consistent with the Current Balance Sheet (as defined below), together with its calculation of Closing Working Capital.  The term "**Closing Working Capital**" means the amount of Working Capital of the Company as of the Closing Time, which is targeted to be One Million Five Hundred Seventy Four Thousand Eight Hundred Sixty Four and No/100 Dollars ($1,574,864.00) (the "**Targeted Closing Working Capital**"), which shall be calculated in accordance with the Working Capital Accounting Principles, and, to the extent not inconsistent with the Working Capital Accounting Principles, the same accounting methods, policies, practices and procedures, with consistent classifications and estimation methodologies, as were used in the preparation of the balance sheet included in the Interim Financial Statements (the "**Current Balance Sheet**"). Such calculations shall be based exclusively on the facts and circumstances as

11

they exist as of the Closing Time and shall exclude the effects of any event, act, change in circumstances or similar development arising or occurring thereafter or which arises out of or in connection with the transactions contemplated hereby.

(d)     During the fifty (50) days after delivery of the Closing Balance Sheet and calculations of Closing Working Capital, the Seller and his accountants will be permitted, at the Seller's expense, to review the working papers of the Buyer and their accountants relating to the preparation of the Closing Balance Sheet and calculations of Closing Working Capital. Seller shall have fifty (50) days after receiving the Closing Balance Sheet and calculation of Closing Working Capital in which to deliver written notice of objection thereto to Buyer setting forth in reasonable detail the basis of the dispute. Failure to object in writing within such 50-day period shall constitute Seller's final and binding acceptance of the Closing Balance Sheet and calculation of Closing Working Capital. If Seller notifies Buyer of any dispute, then the parties will negotiate in good faith in an effort to resolve such dispute. If the parties are unable to resolve such dispute within 50 days after Buyer receives written notice of the same, then either party may submit such dispute to an agreed-upon independent, regionally recognized accounting firm; provided, however, that if the parties cannot come to such mutual agreement, Grant Thornton LLP shall serve as the neutral accountant (the "**Neutral Accountant**"). The Neutral Accountant shall be instructed to determine (the "**Neutral Determination**") the unresolved matters in dispute, applying the principles set forth in this <u>Section 1.05</u> and, twenty (20) days after being selected, to deliver a written report to the Buyer and the Seller setting forth the Neutral Determination and the reasons therefor. The Neutral Accountant shall, in connection such dispute, have access to all books, records and work papers necessary to perform its functions hereunder. The Neutral Accountant's decision shall be final, conclusive and binding on all parties. A judgment on the Neutral Determination may be entered and enforced by any court of appropriate jurisdiction. The fees and expenses of the Neutral Accountant shall be borne equally between the Buyer, on the one hand, and the Seller, on the other hand.

(e)     If Closing Working Capital, as finally determined, whether by Seller's failure to object to the Closing Balance Sheet and calculations of Closing Working Capital within the 50-day period provided above, by mutual agreement of Seller and Buyer or by determination of the Neutral Accountant, is (i) less than 90% of the Targeted Closing Working Capital, then the Seller shall pay to Buyer the amount of such deficiency (dollar-for-dollar) in immediately available funds to the account designated by the Buyer or (ii) in excess of 110% of the Targeted Closing Working Capital, then Buyer will pay to Seller (to the accounts designated by the Seller) the amount of such excess (dollar-for-dollar), in each case by wire transfer of immediately available funds to the account designated by the Seller (such final amount, the "**Final WC Adjustment**"); provided, however, that notwithstanding the foregoing, such Final WC Adjustment shall not exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000). All payments under this subsection will be made within fifteen (15) days after Closing Working Capital has been finally determined.

**Section 1.06   Holdback**.

(a)     In consideration for potential overstatements of the Company's financial performance based on certain fulfillment contracts and the Held Back Inventory, on the Closing Date, Buyer shall withhold Two Million Four-Hundred Seventy-Four Thousand and No/100

Dollars ($2,474,000) (the "**Fulfillment Holdback**") and Two Hundred Eighty Eight Thousand Six Hundred Thirty Five and No/100 Dollars ($288,635) (the "**Inventory Holdback**", together with the Fulfillment Holdback the "**Holdback**"). The Fulfillment Holdback was calculated by the following "**Fulfillment Holdback Formula**": (["**Variable Amount**"] x 9) x .51. Under this Section 1.06(a), the Variable Amount for the purposes of the Fulfillment Holdback Formula is equal to $539,000. Subject to the procedures in Sections 1.06(b) and (c) below, the timeline for Seller to claim disbursement of the Holdback (or any portion thereof) shall commence on the Closing Date and end on the one (1) year anniversary of the Closing Date; provided however, that such period may be extended for an additional six (6) months upon Seller's good-faith request (the "**Holdback Period**").

(b)     **Fulfillment Holdback**. During the Holdback Period, the Company will request up to four (4) proposals ("**RFPs**") from fulfillment companies. Buyer, Seller, and Company shall in good faith review such RFPs and shall agree upon which RFP to accept (the "**New Fulfillment Contract**"). Such New Fulfillment Contract agreed upon shall be reasonably based upon the short and long-term business needs of the Company. Once the New Fulfillment Contract is accepted, the value of the Fulfillment Holdback due to Seller will be determined by the terms of the Fulfillment Holdback Formula, with such Variable Amount equaling the cost savings (inclusive of near and long-term cost savings) of such New Fulfillment Contract as determined by the Company reasonably and in good faith, but in no event exceeding $539,000 (the value of such calculation the "**Fulfillment Holdback Value**"). Once the Fulfillment Holdback Value is determined, Buyer shall cause such Fulfillment Holdback Value to be released to Seller. Any remaining amount of the Fulfillment Holdback shall be returned to Buyer with no further claim by Seller.

(c)     **Inventory Holdback.** At any time during the Holdback Period, the Seller may submit to Buyer an "**Inventory Holdback Statement**" including the following information: (i) gross sales receipts identifying the quantity and sales price of any Held Back Inventory sold (the sum of such gross sales the "**Inventory Holdback Value**"); and (ii) reasonable proof demonstrating that the sold inventory was in fact part of the Held Back Inventory. During the thirty (30) days after delivery of the Inventory Holdback Statement, the Buyer, its lawyers, and its accountants will be permitted, at the Buyer's expense, to review the Inventory Holdback Statement and any documentation supporting such Inventory Holdback Statement and as reasonably requested by Buyer and its agents. If the Inventory Holdback Statement is determined to be accurate, as determined from the standpoint of a reasonable person, Buyer shall release such Inventory Holdback Value to Seller, and the Inventory Holdback shall be depleted by such Inventory Holdback Value released. Any remaining amount of the Inventory Holdback shall continue to be withheld by Buyer with no further claim by Seller unless Seller submits another Inventory Holdback Statement during the Holdback Period. In any event, at the expiration of the Holdback Period, any value of the Holdback which remains in Buyer's possession shall so remain, and Seller shall have no further claim to such Holdback or any remaining value.

(d)     **Inventory Holdback Bonus**. The Parties hereby agree that at the end of each Fiscal Year during the Holdback Period, the Company shall in good faith determine the Inventory Holdback Bonus, if any, which shall be payable from Company to Seller. The "**Inventory Holdback Bonus**" shall mean the Company's gross profits derived from sales of the Held Back Inventory, which shall be determined by taking the gross sales of such Held Back

Inventory and deducting twenty-five percent (25%) from the value of such gross sales; provided, however, that the Inventory Holdback Bonus shall only be payable if the Inventory Holdback has been completely depleted under Section 1.06(c) above and shall only begin to accrue once such Inventory Holdback has been depleted. Such Inventory Holdback Bonus shall be paid by Company to Seller within sixty (60) days of the end of such applicable Fiscal Year.

(e)    **Held Back Inventory Sales**. The Parties hereby acknowledge that prior to any and all sales of Held Back Inventory, the Seller, Buyer, and Company shall mutually agree in good faith on the sales channel(s) such Held Back Inventory shall be sold in.

**Section 1.07    Allocation of Purchase Price**.

(a)    For purposes of making filings pursuant to Section 1060 of the Code, and the regulations thereunder, the Parties and the Company each agree that the Final Purchase Price and any other items properly treated as consideration for U.S. federal income tax purposes, shall be allocated with respect to the assets of the Company (including, without limitation, the Non-Compete and any goodwill associated with the business or businesses of the Company) in accordance with the agreement (the "**Purchase Price Allocation Agreement**") which the Parties and the Company shall enter into within ninety (90) days after the Closing to allocate the purchase price among the various assets of the Company (the "**Purchase Price Allocation**").

(b)    Seller, at Seller's expense, shall have ten (10) days after delivery, from either the Buyer and/or the Company to the Seller, of the tentative purchase price allocation, to review such allocation and to deliver written notice of objection thereto to Buyer setting forth in reasonable detail the basis of the dispute. Failure to object in writing within such 10-day period shall constitute Seller's final and binding acceptance of the tentative purchase price allocation, at which point such allocation shall become the Purchase Price Allocation. If Seller notifies Buyer of any dispute within the requisite 10-day period, then the parties will negotiate in good faith in an effort to resolve such dispute. If the parties are unable to resolve such dispute within 14 days after Buyer receives written notice of the same, then either party may submit such dispute to a mutually agreed-upon independent, regionally recognized accounting firm; provided, however, that if the parties cannot come to such mutual agreement, Grant Thornton LLP shall serve as the Neutral Accountant. The Neutral Accountant shall be instructed to determine the unresolved matters in dispute (the "**Neutral PPA**") by applying the U.S. Federal income tax laws and guidance pertaining to the same. The Neutral Accountant shall, in connection with such dispute, have access to all books, records and work papers necessary to perform its functions hereunder including reasonable access to the Parties and Company for purposes of seeking oral clarification of any matters pertinent to resolving the dispute. The Neutral Accountant's decision shall be final, conclusive and binding on all parties. A judgment on the Neutral PPA may be entered and enforced by any court of appropriate jurisdiction. The fees and expenses of the Neutral Accountant shall be borne equally between the Buyer, on the one hand, and the Seller, on the other hand.

**Section 1.08    Tax Treatment**. The Parties and the Company acknowledge and agree that the Buyer's purchase of the Majority Interest is intended to be treated in all material respects in the same fashion for U.S. federal income tax purposes (and applicable state, local and foreign income Tax purposes) as "Situation 1" as set forth an analyzed by Treasury in Rev. Rul. 99-5, 1999-6 I.R.B. 8 (Feb. 8, 1999) (the "**Intended Tax Treatment**"). The Parties and the Company

agree that they shall each characterize the Buyer's purchase of the Majority Interest for all U.S. federal, state and local income tax purposes in a form and fashion consistent with the Intended Tax Treatment.

## ARTICLE 2.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Seller hereby represents and warrants to the Buyer as to Seller and Seller's Interest, that, except as set forth in the disclosure schedule attached hereto (the "**Disclosure Schedule**") the following statements are true and correct as of the Closing Date.

**Section 2.01   Existence and Good Standing / Authority and Enforceability**. Seller has all requisite capacity, power and authority to execute, deliver and perform his obligations under this Agreement and each agreement, document, instrument or certificate required by this Agreement to be executed, delivered and performed by Seller. This Agreement has been duly executed and delivered by Seller and, assuming that this Agreement constitutes a valid and binding agreement of the Buyer and the Company, constitutes a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

**Section 2.02   Conflict with Laws**. The execution and delivery of this Agreement and the performance by Seller of its obligations hereunder will not conflict with or violate (A) any Law that is applicable to Seller or Company or (B) the organizational documents of the Company, or (ii) result in the creation or imposition of any Lien with respect to, or otherwise have materially impaired the ownership or transfer of the Majority Interest owned by Seller.

**Section 2.03   Ownership of the Interest**.

(a)      Seller owns, beneficially and of record, all of the Interest in the Company, free and clear of all Liens and, upon the consummation of the Sale of Majority Interest, the Buyer will have good title to the Majority Interest free and clear of all Liens. Other than the Interest, Seller has no outstanding securities convertible into or exchangeable for any equity in the Company or any options, warrants or other rights to purchase or subscribe to any equity in the Company.

(b)      Intentionally deleted.

(c)      The capital accounts of the Seller as of December 31, 2022 and as of the Closing Time were:

|         | December 31, 2022 | Closing Time |
|---------|-------------------|--------------|
| Hughes  | $621,402.39.00    | See below.   |

The Parties hereby acknowledge that the capital accounts of both Buyer and Seller at the Closing Time shall be determined when the Final Purchase Price is calculated in accordance with Article 1 above, whereby the Closing Time capital account of Buyer shall equal the Final Purchase Price and the Closing Time capital accounts of Buyer and Seller shall equal 51% and 49% of the total capital accounts of the Company, respectively.

DocuSign Envelope ID: 0755C7A4-73B1-41D8-9637-3EE451630D65

**Section 2.04   Litigation**. Seller has not received any written notice of, and to Seller's Knowledge there is no Action pending against or threatened against Seller or with respect to Seller's Interest before any Government Agency, nor to Seller's Knowledge is there a basis for any such action, suit, claim, proceeding or investigation which would prohibit Seller from closing on the transaction contemplated by this Agreement. Seller is not subject to any judgment, award, order, writ, injunction, arbitration, decision or decree which would affect the purchase and sale of the Company.

**Section 2.05   Consents and Approvals; No Violations.   To Seller's Knowledge,** no notices to, filings with, or authorization, consent or approval of any Governmental Agency is necessary for the execution, delivery or performance by Seller of this Agreement or the Ancillary Documents to which Seller is a party or the consummation by Seller of the transactions contemplated hereby or thereby.  Neither the execution, delivery or performance by Seller of this Agreement and the Ancillary Documents to which Seller is a party nor the consummation by Seller of the transactions contemplated hereby will (a) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or give rise to any right of termination, notice, cancellation or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, contract, agreement or other instrument or obligation to which Seller is a party or by which it or any of its properties or assets may be bound, or (b) to Seller's Knowledge, violate any order, writ, injunction, decree, law, statute, rule or regulation of any Governmental Agency applicable to Seller.

**Section 2.06   Brokers and/or Finders**.  Neither the Seller nor any of its Affiliates has incurred, directly or indirectly (whether arising prior to or after the Closing), any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the Sale of Majority Interest other than with the Bank of the West pursuant to separate agreement with the Seller. Seller shall be solely responsible for any fees, commissions or other similar charges due to Bank of the West, BNPP Group relating to the transactions contemplated hereunder.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND SELLER

The Company and Seller have made available to Buyer in a password protected data room at https://www4.idealsvdr.com/ ("**Data Room**") all Company information related to the business as set forth in that certain due diligence checklist between Buyer and Seller (the "**Due Diligence Checklist**"). The Company and Seller jointly and severally represent and warrant to the Buyer that, except as set forth in the Disclosure Schedule attached hereto, the following statements are true and correct in all material respects as of the Closing Date:

**Section 3.01   Authority and Enforceability**. The Company has all requisite power and authority to execute, deliver and perform its obligations under this Agreement. The execution, delivery and performance of this Agreement and the consummation of the Sale of Majority Interest have been duly authorized by all necessary limited liability company action on the part of the Company. This Agreement has been duly executed and delivered by the Company, and assuming that this Agreement constitutes the valid and binding agreement of the Buyer,

constitutes the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

**Section 3.02    Conflicts and Required Consents**. The execution and delivery of this Agreement and the consummation of the Sale of Majority Interest by the Company does not:

(a)    violate, conflict with or result in the breach or default of any provision of the Company's Articles of Organization dated May 18, 2016, as amended August 25, 2020 ("the "**Articles**", together with the Amended Operating Agreement, the "**Governing Documents**").

(b)    to Seller's Knowledge and the Company's Knowledge, conflict with or violate any Law applicable to the Company or by which any of its assets are bound;

(c)    to Seller's Knowledge and the Company's Knowledge, require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Government Agency or any other Person; or

(d)    conflict with, result in any material violation or material breach of, constitute a default under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Lien on any material assets of the Company or the imposition or acceleration of any payment, time of payment, vesting or increase in the amount of compensation or benefit payable pursuant to any Material Contract to which the Company is a party or by which any of the material assets of the Company are bound.

**Section 3.03    Organization**. The Company is duly organized and validly existing under the laws of the State of California and has all limited liability company or similar powers and authority to own, lease and operate its assets and to conduct its business as it is now being conducted. The copies of the Articles and Operating Agreement, which have been made available to Buyer, are correct and complete, are the only such documents currently in effect, and the Company is not in violation of any term of its Articles or Operating Agreement.

**Section 3.04    Capital Structure**. The Interest is validly issued, fully paid and nonassessable and is not subject to, and has not been issued in violation of preemptive or other similar rights. There are no options or outstanding securities convertible into, or exchangeable or exercisable for, equity interests in the Company. There are no calls, puts, rights of first refusal or offer, preemptive rights, commitments or agreements to which the Company is a party or by which it is bound, in any case obligating the Company to issue, deliver, sell, purchase, redeem or acquire, or cause to be issued, delivered, sold, purchased, redeemed or acquired, any equity interests in the Company, or obligating the Company to grant, extend or enter into any such option, warrant, call, right, commitment or agreement, immediately following the Sale of Majority Interest.

**Section 3.05    Financial Statements**.

(a)    Section 3.05(a) of the Disclosure Schedule sets forth true and complete copies of (i) the Company's audited balance sheet as of May 31, 2021 and the related statements of income, cash flows and changes in members' equity for the annual periods ending as of such

date, (ii) the Company's reviewed balance sheet as of May 31, 2022 and the related reviewed statements of income, cash flows and changes in members' equity for the annual periods ending as of such date (collectively, the "**Financial Statements**") and (iii) the unaudited and unreviewed internal balance sheet as of December 31, 2022 and the related unaudited and unreviewed statement of income for the period ending December 31, 2022 (collectively, the "**Interim Financial Statements**"). The Financial Statements (i) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, except as may be indicated in the notes, and (ii) fairly present, in all material respects, the financial condition, the assets and results of operations of the Company as of the dates thereof and for the periods therein referred to. The Interim Financial Statements were prepared in accordance with GAAP, applied on a consistent basis throughout the periods covered thereby, in good faith using reasonable assumptions and based upon information reasonably believed by Seller and the Company to be true.

(b)    Except as set forth in Section 3.05(b) of the Disclosure Schedule, the Company has no liability or obligation, secured or unsecured (whether absolute, accrued, contingent or otherwise, and whether due or to become due), except such liabilities and obligations that are adequately accrued or reserved against in the Financial Statements or disclosed in the notes thereto.

Section 3.06   **Title to Assets; Sufficiency**. Section 3.06 of the Disclosure Schedule lists all assets owned by Company as of Closing Time.  Except as set forth in Section 3.06 of the Disclosure Schedule, the Company has good, valid and marketable title in all of the tangible personal property and assets used in the business of the Company, in each case free and clear of all Liens. The Company has no subsidiaries or any interests in any other legal entity, and has not granted any guarantee, indemnity, letter of comfort or provided any similar undertaking on behalf of any other Person. The Company is the only entity through which the Company's business is conducted, and the assets and properties, tangible and intangible, currently owned, leased or licensed by the Company constitute all of the assets and properties used in the conduct of the Company's business as of the date of this Agreement.  All such personal property and assets have been maintained in accordance with normal industry practice for California wineries, are in sufficient operating condition and repair (subject to normal wear and tear), are suitable for the purposes for which they are presently used and are free from material defects.

Section 3.07   **Accounts Receivable**. Except as disclosed in Section 3.07 of the Disclosure Schedule, all accounts receivable of the Company reflected on the Interim Financial Statements represent valid obligations arising from services actually performed, subject to any reserves set forth in the Company's Interim Financial Statements. The reserves on the Financial Statements against the accounts receivable of the Company are adequate and have been calculated in a manner consistent with past practice. There are no disputes with respect to any of the accounts receivable reflected on the Interim Financial Statements and no counter claims, defenses or offsetting claims with respect to the accounts or notes receivable of the Company are pending or threatened. Other than as reflected in the Financial Statements, or as consistent with past practice since the date of the Interim Financial Statements, the Company has not agreed to any deduction, free goods, discount or other deferred price or quantity adjustment with respect to any of its accounts receivables.

**Section 3.08   Inventory**. The inventory of the Company consists of a quality and quantity usable in the ordinary course of business consistent with past practice. All inventory is owned by the Company free and clear of Liens other than Permitted Liens. The quantities of each item of inventory (whether raw materials, work in process or finished goods) are not excessive and have been maintained at such amounts as are reasonably required for the operation of the business in the ordinary course as determined by the Company.

**Section 3.09   No Changes**. Since November 10, 2022 through the Closing Date, except as otherwise provided in this Agreement or in connection with the Sale of Majority Interest, the Company has operated in the ordinary course of business consistent with past practice in all material respects and has not:

    **(a)**    (i) merged or consolidated with any corporation, partnership, association or other business organization, (ii) sold, leased, licensed, or otherwise transferred or disposed of any of its assets, other than sales of inventory or sales or returns of obsolete or surplus equipment in the ordinary course of business consistent with past practice, or (iii) adopted a plan of complete or partial liquidation or dissolution;

    **(b)**    except as required by Law or by any Contract (i) granted any increases in compensation (including salary, bonus and other benefits) for any of its directors, officers, or employees, (ii) paid or agreed to pay any pension, retirement allowance or other employee benefit to any director, officer, or employee, whether past or present, (iii) entered into any new, or amend any existing, employment or severance or termination agreement with any Person, (iv) become obligated under any new Benefit Plan or employee agreement which was not in existence on the date hereof, accelerate the payment or vesting of any benefits under any Benefit Plan, or amend any such plan or arrangement in existence on the date hereof if such amendment would have the effect of enhancing any benefits thereunder, (v) granted any material general increase in compensation (including salary, bonus and other benefits) to employees or Hughes, (vi) extended any loans or advances to any of its directors, officers, or employees, or (v) made any commitment or incur any liability to any labor organization;

    **(c)**    except in the ordinary course of business consistent with past practice (i) assumed or incurred any material Indebtedness for borrowed money, (ii) guaranteed any obligations of any other Person, or (iii) created any Lien (other than Permitted Liens) on the property of the Company;

    **(d)**    except in the ordinary course of business consistent with past practice (i) entered into any Material Contract or (ii) terminated, released, amended in any material respect any of the terms or provisions of, or grant any waiver or consent with respect to, any Material Contract;

    **(e)**    (i) made any material change in the Tax reporting or accounting principles, practices or policies, including with respect to (A) depreciation or amortization policies or rates or (B) the payment of accounts payable or the collection of accounts receivable; (ii) settled or compromised any Tax liability; (iii) made, changed or rescinded any Tax election; or (iv) consented to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes;

**(f)**      authorized or made any capital expenditures or commitments therefor in excess of $10,000 individually or $50,000 in the aggregate;

**(g)**      instituted or settled any Action involving payment or receipt by the Company of more than $10,000 in any individual instance;

**(h)**      made any write-off or write-down of, or made any determination to write-off or write-down, any of its assets and properties in excess of $10,000;

**(i)**      made any material change in the general pricing practices or policies or any change in the credit or allowance practices or policies of the Company;

**(j)**      licensed in or purchased any intellectual property or licensed out or otherwise permitted any Person to use any Intellectual Property Rights;

**(k)**      commenced or terminated any line of business;

**(l)**      entered into any legally binding commitment to take any actions set forth in this Section 3.09;

**(m)**      engaged in any promotional, sales or discount or other activity that has or could reasonably be expected to have the effect of accelerating sales prior to the Closing that would otherwise have been expected to occur after the Closing, in each case other than in the ordinary course of business;

**(n)**      collected its accounts receivable or paid any accrued liabilities or accounts payable or prepaid any expenses or other items, in each case other than in the ordinary course of business; or

**(o)**      agreed or committed to any of the foregoing.

**Section 3.10   Intentionally Deleted.**

**Section 3.11   Intellectual Property Rights**.

**(a)**      Section 3.11(a) of the Disclosure Schedule sets forth a list of all (i) Company IP Registrations and (ii) Company Intellectual Property, including software, that are not registered but that are material to the Company's business or operations (collectively, the "**Intellectual Property Rights**"). The Company has provided Buyer with true copies of the file histories, documents, certificates, office actions, correspondence and other materials currently in the Company's control or possession that are related to all Company IP Registrations.

**(b)**      Intentionally deleted.

**(c)**      Except as set forth in Section 3.11(c) of the Disclosure Schedule, the Company is the sole and exclusive legal and beneficial owner of, and with respect to the Company IP Registrations, the record owner of all right, title and interest in and to, the Intellectual Property Rights, and has the valid right to use all other Intellectual Property used in or necessary for the

conduct of the Company's business as currently conducted, in each case, free and clear of any Liens other than Permitted Liens.

(d)     Except as set forth in Section 3.11(d) of the Disclosure Schedule, the Company's rights in the Intellectual Property Rights are valid, subsisting and enforceable. The Company has taken reasonable steps to protect and maintain the Intellectual Property Rights.

(e)     Except as set forth in Section 3.11I of the Disclosure Schedule, the Intellectual Property Rights and the Intellectual Property licensed under the Company IP Agreements, as currently or formerly owned, licensed or used by Company, have not infringed, misappropriated, diluted or otherwise violated, and have not, do not and will not infringe, dilute, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. Except as set forth in Section 3.11I of the Disclosure Schedule, no Person has infringed, misappropriated, diluted or otherwise violated, or is currently infringing, misappropriating, diluting or otherwise violating, any of the Intellectual Property Rights.

(f)     Except as set forth in Section 3.11(f) of the Disclosure Schedule, there are no Actions (including any oppositions, interferences or re-examinations) settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, mis- or un-authorized use, dilution or violation of the Intellectual Property of any Person by the Company or Seller in connection with the Company's business; (ii) challenging the validity, enforceability, registrability, use or ownership of any of the Intellectual Property Rights or the Company's rights with respect to any Intellectual Property Rights; or (iii) by the Company, Seller or any other Person alleging any infringement, misappropriation, mis- or un-authorized use, dilution or violation by any Person of any Intellectual Property Rights.

(g)     the Intellectual Property Rights together with the Company IP Agreements constitute all of the Intellectual Property necessary to operate the Company's business as currently conducted and will, immediately subsequent to the Closing, be owned or available for use by the Company on terms identical to those in effect immediately prior to the Closing.  The consummation of the transactions contemplated hereunder will not result in the loss or impairment of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Company's or Buyer's right to use or hold for use any Intellectual Property as owned, used or held for use in the conduct of the Company's business as currently conducted;

(h)     all Intellectual Property Rights owned by or developed by and/or for the Company were developed by (i) employees of the Company within the scope of their employment; or (ii) independent contractors who have entered into written agreements with the Company that assigned to the Company all right, title and interest in and to any Intellectual Property Rights developed.

(i)     the Company has taken reasonable steps to protect and preserve the confidentiality of all trade secrets, know-how, confidential information, inventions and discoveries, ideas, manufacturing and production processes and techniques, recipes, formulas, methods, proprietary information, technical information, information that derives economic value from not being generally known, and any other information that would constitute a trade

secret as defined in the Uniform Trade Secrets Act; and under corresponding common law, and all use, disclosure or appropriation thereof by or to any third party has been pursuant to the terms of a written agreement between such third party and the Company; and

**(j)**    the Company, in the conduct of the Company's business, has (i) complied in all respects with its published privacy policies and internal privacy policies and guidelines, related contractual obligations with customers and all applicable laws and regulations relating to data privacy, data collection, data protection, data breach, notification and data security, including with respect to the collection, storage, transmission, transfer (including cross-border transfers), disclosure and use of personally identifiable information (including personally identifiable information of employees, contractors, and third parties) and (ii) taken commercially reasonable measures to ensure that personally identifiable information is protected against loss, damage, and unauthorized access, use, modification or other misuse.  There has been no loss, damage, or unauthorized access, use, unauthorized transmission, modification or other misuse of any such information by Seller or any of his Affiliates, employees, agents, representatives or contractors.

**Section 3.12    Material Contracts**.

**(a)**    Section 3.12 of the Disclosure Schedule contains a list of all current Contracts to which the Company is a party or by which it or any of its assets is bound and which are:

**(i)**    Contracts between the Company and any of the Company's customers providing for the sale or furnishing of the Company's products in excess of $15,000;

**(ii)**    Contracts between the Company and any of the Company's suppliers and/or brokers providing for the purchase of products and services by the Company in excess of $25,000;

**(iii)**    Contracts for the lease of personal property;

**(iv)**    Contracts for the lease of real property;

**(v)**    Company IP Agreements;

**(vi)**    Contracts granting or restricting the use of any Intellectual Property Rights;

**(vii)**    employment, consulting or similar Contracts providing for payments to any individual natural Person in excess of $25,000 per calendar year;

**(viii)**    joint venture, partnership or similar Contracts involving the sharing of profits, losses, costs or liability by the Company with any other Person;

**(ix)**    Contracts under which the Company has borrowed or loaned any money in excess of $50,000 or issued or received any note, bond, indenture or other evidence of Indebtedness in excess of $50,000 or directly or indirectly guaranteed Indebtedness, liabilities or

obligations of others in an amount in excess of $50,000 or granted a Lien on any property or asset of the Company;

**(x)**    Contracts containing covenants limiting the freedom of the Company to compete in any line of business or with any Person or in any geographic area or market or not to solicit or hire any Person;

**(xi)**    Contracts for the guarantee of the borrowing of money by, or extension of credit to, any other Person;

**(xii)**    Contracts with any Affiliate, director, officer, employee, shareholder or member of the Company or Affiliates of Seller;

**(xiii)**    Contracts involving the acquisition of any business enterprise whether via stock or asset purchase or otherwise;

**(xiv)**    Contracts granting a power of attorney to any Person;

**(xv)**    distributor agreements;

**(xvi)**    production, custom crush, alternating proprietor, or service agreements;

**(xvii)**    Logistics, fulfillment, warehouse, and shipping agreements;

**(xviii)**    confidentiality agreements, non-competition agreements, non-solicitation agreements and non-disclosure agreements or other commitments still in effect prohibiting the Company from freely engaging in any material business;

**(xix)**    collective bargaining agreements, labor contracts or other written agreements or arrangements with any labor union or any employee organization; and

**(xx)**    contracts, arrangements or understandings that relate to the future disposition or acquisition of material assets or properties by the Company, or any merger or business combination with respect to the Company.

 (The Contracts described in clauses (i)-(xx) are each a "**Material Contract**" and collectively, the "**Material Contracts**").

**(b)**    The Company has provided the Buyer with access to true and complete copies (or in the case of any oral agreements, a written summary) of each Material Contract, as amended in the Data Room. Each Material Contract is, in all material respects, the valid and binding obligation of the Company is in full force and effect, and is enforceable against the other parties thereto, in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium and other similar Laws now or hereafter in effect relating to creditors' rights generally and general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity). With respect to the Material Contracts, except as set forth in Section 3.12(b) of the Disclosure Schedule (i) the Company has

not received any written notice that the Company is in material breach or material default under any Material Contract, and, to the Seller's Knowledge and the Company's Knowledge, no other party is in material breach or material default thereunder, (ii) to the Seller's Knowledge and the Company's Knowledge, the Company has not waived any of its material rights under any Material Contract; (iii) to the Seller's Knowledge and the Company's Knowledge, no event or condition has occurred that, with notice or with the passage of time or both, would constitute, a material default by the Company under any Material Contract; and (iv) no party to a Material Contract has repudiated any of the terms thereof in writing to the Seller or the Company or threatened in writing to terminate, cancel or not renew any Material Contract.

Section 3.13   **Compliance with Law**. To the Seller's Knowledge and the Company's Knowledge, except as disclosed on Section 3.13 of the Disclosure Schedule, the Company is not in material violation of any applicable Law and has not previously been in material violation of any applicable law which may result in any potential liability of the Company. To the Seller's Knowledge and the Company's Knowledge, the Company is not under investigation by any Government Agency with respect to and has not been threatened by any Government Agency to be charged with or given notice of, any actual or alleged violation or potential violation of, any applicable Law.

Section 3.14   **Material Permits**. Section 3.14 of the Disclosure Schedule sets forth a true and complete list and description of all licenses, registrations, permits, certificates, approvals, consent or other similar authorizations issued by a Government Agency ("**Permits**") held by the Company and used by them in the conduct of its business (collectively, the "**Material Permits**"). The Material Permits are valid and in full force and effect, and the Company is not in violation of any of the material requirements of any Material Permits. None of the Material Permits will lapse, terminate, expire or be impaired in any material respect as a result of the consummation of Sale of Majority Interest.

Section 3.15   **Insurance**. Set forth in Section 3.15 of the Disclosure Schedule is a list of all material insurance policies ("**Insurance Policies**") covering the assets, business, equipment, properties, operations, employees, officers and directors of the Company. There is no claim by the Company pending under any of such Insurance Policies as to which the Company has received written notice that coverage has been denied or disputed by the underwriters of such Insurance Policies, or for which an insurer has expressed in writing any reservation of rights with respect to such coverage. With respect to each Insurance Policy, (a) the Insurance Policy is in full force and effect, (b) all premiums due under such Insurance Policy have been paid,  (c) to the Seller's Knowledge and the Company's Knowledge, there is no breach or default by the Company, and no event has occurred that, with notice or the lapse of time, would constitute a breach or default or permit termination, modification or acceleration under the Insurance Policy and the execution of this Agreement and the consummation of the sale of the Majority Interest will not result in such breach or default or permit any such termination, modification or acceleration; and (d) with respect to workers' compensation insurance, the Company has truthfully, completely and accurately reported all hours worked, all payroll, wages, and compensation paid, and all other information required by Law to its workers' compensation insurance carrier, and that there are no audits, contests, disputes, notices or proceedings relating to Company's obligations to report information and to pay all premiums due to its workers' compensation carrier. Neither Seller nor the Company

has received any written threatened termination, cancellation or non-renewal of, or premium increase with respect to, any such Insurance Policies.

**Section 3.16  Litigation**. There is no Action pending for which the Seller or Company has received written notice or to the Seller's Knowledge and the Company's Knowledge, threatened, against the Company before any Government Agency, related to or affecting the Company or its business, operations or assets. There is no Action pending or to the Seller's Knowledge and the Company's Knowledge, threatened, against the Company which would prevent, enjoin, alter or materially delay the Sale of Majority Interest. Section 3.16 of the Disclosure Schedule lists all Actions to which the Company was a party during the past five (5) years (whether or not settled).

**Section 3.17  Taxes**.

**(a)**  Except as set forth in Section 3.17(a) of the Disclosure Schedule, the Company has timely filed all Tax Returns that it was required to file under applicable laws and regulations.  Except as set forth in Section 3.17(a) of the Disclosure Schedule, all such Tax Returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations.  Except as set forth in Section 3.17(a) of the Disclosure Schedule, all Taxes due and owing by Company (whether or not shown on any Tax Return) have been paid.

**(b)**  The Company has withheld, and timely paid and deposited with the applicable taxing authority, all Taxes required to have been withheld, paid and deposited by it in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, member, partner, or other third party.

**(c)**  Neither Seller nor the Company has received any written notice of, and to Seller's Knowledge or to the Company's Knowledge, there are no pending or threatened Claims by any Government Agency with respect to Taxes of the Company. No extension or waiver of the limitation period applicable to the assessment or payment of any Tax of the Company or the filing of any Tax Return of the Company required to be filed is in effect or has been requested. All deficiencies claimed, proposed or asserted or assessments made as a result of any examinations by any Government Agency of any Tax Returns of the Company have been fully paid or fully settled, or are being contested in good faith by appropriate proceedings and for which adequate reserves have been made for such Taxes on the Financial Statements. There are no Liens for Taxes on any of the assets of the Company, except Permitted Liens. No power of attorney that currently is in effect has been granted by the Company with respect to any Tax matter. Neither Seller nor the Company has received any written notice of, and to the Seller's Knowledge and to the Company's Knowledge, the Company is not currently the subject of a Tax audit or examination. The Company has not received from any taxing authority any written notice of proposed adjustment, deficiency, underpayment of Taxes or any other such written notice which has not since been satisfied by payment or been withdrawn. The Company has not received from any taxing authority any written claim from any taxing authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction.

      **(d)**     The Company (i) is not and has not ever been classified as a "corporation" within the meaning of Treasury Regulations Section 301.7701-2(b) and (ii) is not and will not be liable for Taxes of any Person (other than its own Taxes) by reason of contract, agreement, assumption, transferee liability, successor liability, operation of law or otherwise.

      **(e)**     The Company is not a party to any joint venture, partnership, other arrangement or contract that could be treated as a partnership for federal income Tax purposes.

      **(f)**     The Company is not a party to any Tax sharing, allocation or indemnity agreement, arrangement or similar Contract.

      **(g)**     The Company has not been a member of an affiliated group or filed or been included in a combined, consolidated or unitary income Tax Return.

      **(h)**     The Company will not be required as a result of (i) a change in method of accounting for a Pre-Closing Tax Period, (ii) use of an improper method of accounting for a Pre-Closing Tax Period, (iii) any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign law), (iv) any installment sale or open transaction disposition made on or before the Closing Date, (v) the receipt of any prepaid revenue before the Closing Date, or (vi) an election under Section 108(i) of the Code, to include any item of income or exclude any item of deduction for any taxable period ending after the Closing Date that would not have otherwise so been included or excluded as the case may be.

      **(i)**     The Company does not have a permanent establishment (within the meaning of an applicable Tax treaty) or otherwise have an office or fixed place of business in a country other than the United States.

      **(j)**     The Company is, and has been since its formation, properly classified as a partnership or disregarded entity for U.S. federal (and, where applicable, state and local) income Tax purposes and no election has been made pursuant to Treasury Regulation Section 301.7701-3(g) to treat the Company as an association taxable as a corporation.

      **Section 3.18   Employee Benefits**.  At no point has the Company ever had any pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity or other equity, change in control, retention, severance, medical, vision, dental, disability, welfare, Code Section 125 cafeteria, fringe benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by the Company for the benefit of any current or former employee, officer, manager, retiree, independent contractor or consultant of the Company or any spouse or dependent of such individual, or under which the Company or any of its ERISA affiliates has or may have any liability, or with respect to which Buyer would reasonably be expected to have any liability, contingent or otherwise.

      **Section 3.19   Employment Matters**. Set forth in Section 3.19 of the Disclosure Schedule is a list of each written or oral employment agreement between the Company and any of its

employees ("**Company Employees**"). The Company has made available to the Buyer copies of each such agreement or provided a written summary of any oral agreements. The Company (a) is in material compliance with all applicable Laws respecting employment, employment practices, terms and conditions of employment and wages and hours, (b) has not failed to withhold and/or report all amounts required by Law or contract to be withheld and reported with respect to wages, salaries and other payments to Company Employees, (c) has no liability for any arrears of wages or any taxes or any penalty for violation of any of the foregoing, (d) has no liability for any payment to any trust or other fund governed by or maintained by or on behalf of any Government Agency, with respect to unemployment compensation benefits, social security, labor or workers' compensation insurance or other benefits or obligations for Company Employees (other than routine payments to be made in the normal course of business, consistent with past practice), and (e) has, as of the Closing Date, fully paid all compensation due to any employee of the Company who has been terminated (for whatsoever reason) within the last two (2) years, no later than the last day of such terminated employee's employment by the Company or within the time limit allowed by applicable law, including ORS 652.140.

Section 3.20   **Labor Relations**. The Company has no collective bargaining agreements with any labor organization relating to Company Employees. No collective bargaining agreements relating to any Company Employees are being negotiated as of the date hereof. No union organizational campaign or representation petition is currently pending or threatened with respect to any Company Employees. There is no pending or threatened, strike, slowdown, lock-out, work-stoppage, union organizing effort or other labor dispute, labor board proceeding, labor arbitration proceeding, or administrative tribunal proceeding, involving any Company Employees. There are no complaints filed with any Government Agency by any Company Employee against the Company claiming that it has violated any applicable Law relating to employee or human rights. There are no complaints or proceedings of any kind involving the Company before any labor relations board. There are no outstanding orders or charges in respect to any Company Employee against the Company under any applicable Law relating to health and safety. No grievance, arbitration or other proceeding arising, or asserted to arise, out of or under a collective bargaining agreement, relating to a Company Employee is pending.  The Company is not subject to any unsatisfied or pending settlement agreement, conciliation agreement, letter of commitment, deficiency letter or consent decree with any Company Employee or applicant for employment, labor union or other representative, or any Government Agency or arbitrator relating to claims of unfair labor practices, employment harassment, discrimination, wrongful termination, or other claims with respect to employment and/or labor practices and policies.

Section 3.21   **Intentionally deleted.**

Section 3.22   **Bank Accounts**. Set forth in <u>Section 3.22</u> of the Disclosure Schedule are the names and locations of all financial institutions where the Company maintains a checking account, deposit account, securities account, safety deposit box or other deposit or safekeeping arrangement, and the names of all Persons authorized to draw against any funds therein and the related authorities thereto, including maximum authorized amounts and joint signatory requirements.

**Section 3.23    Customers; Material Suppliers**.

(a)    The Company has provided Buyer with a summary list of customers of the Company who have purchased goods from the Company in the last three (3) years;

(b)    The Company has provided Buyer with a summary list of subscribers to the Company's Email List Serve and SMS List Serve.

(c)    Section 3.23(c) of the Disclosure Schedule sets forth the top ten (10) suppliers of the Company (based on the dollar amount of purchases from such suppliers on a consolidated basis) for each of the years ended 2020, 2021 and interim period of 2022 ("**Material Suppliers**").  No Material Supplier represents a sole source of supply for goods and services used in the conduct of the Company's business.

(d)    Except as set forth in Section 3.23(d) of the Disclosure Schedule, (i) no Material Supplier has cancelled, terminated or materially altered its business relationship with the Company, or communicated in writing its intent to do so, (ii) no Material Supplier has reduced materially its business with the Company from the levels achieved during the year ended 2021, and no Material Supplier has indicated in writing an intention to do so; (iii) the Company is not a defendant in, or a material party to, any claim, dispute or controversy with any Material Supplier, (iv) there has been no material change to any payment terms with respect to amounts owed by the Company to any Material Supplier, and (v) the Company is not a defendant in, or a material party to, any material claim, dispute or controversy with any of its customers or suppliers.

**Section 3.24    Company Records**. The Company's books and records are accurate in all material respects. The Company's minutes, consents and resolutions previously delivered to the Buyer or its representatives contain accurate summaries of the meetings and decisions to which they relate.

**Section 3.25    Brokers and/or Finders**. The Company has not incurred, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the Sale of Majority Interest other than the with the Bank of the West pursuant to separate agreement between the Company and/or Seller and the Company and/or Seller shall be solely responsible for any fees, commissions or other similar charges due to Bank of the West, BNPP Group relating to the transactions contemplated hereunder ("**Seller Broker Expense**").

**Section 3.26    Related Party Transactions**. Except as set forth in Section 3.26 of the Disclosure Schedule, none of the Company, the Seller or any of their respective Affiliates, nor, to the Company's Knowledge, any current manager, officer or employee of the Company: (a) has any direct or indirect interest (i) in any Person that is a supplier, lessor, lessee, creditor or competitor of the Company, or (ii) in any material property or asset that is used by the Company in the conduct of its business, or (b) is a party to any agreement or transaction with the Company.

**Section 3.27    Undisclosed Liabilities. Except as set forth in Section 3.26 of the Disclosure Schedule,** The Company does not have any material liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), except for

liabilities that (a) are accrued or reserved against in the Financial Statements, (b) were incurred since December 31, 2021 in the ordinary course of business, (c) would be required to be disclosed on the Financial Statements under GAAP, (d) result from the obligations of the Company under this Agreement or the Ancillary Documents, (e) liabilities and obligations pursuant to any contract listed in Section 3.12 of the Disclosure Schedules or not required by the terms of this Agreement to be listed in Section 3.12 of the Disclosure Schedule, in either case which arose in the ordinary course of business and did not result from any default, tort, breach of contract or breach of warranty, or (f) are not material individually or in the aggregate.

Section 3.28   **Product Liability.**  Schedule 3.28 sets forth an accurate, correct and complete list and summary description of all existing claims, duties, responsibilities, liabilities or obligations arising from or alleged to arise from any injury to person or property as a result of the ownership, possession or use of any product produced, distributed or sold by the Company. Subject to Schedule 3.28, the Company has no material liability (and to the Company's Knowledge, there is no reasonable basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against the Company giving rise to any liability) arising out of any injury to individuals or property as a result of the ownership, possession, or use of any product produced, sold, distributed, or delivered by the Company or any of its predecessors.

Section 3.29   **Material Untruth.**  This Agreement does not knowingly contain any untrue statement of a fact or knowingly omit to state a fact necessary to make the representations and warranties contained herein not misleading in any material manner.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller and the Company that the following statements are true and correct as of the Closing Date.

Section 4.01   **Organization.** The Buyer is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

Section 4.02   **Authority and Enforceability.** The Buyer has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and to consummate the Sale of Majority Interest. The execution and delivery of this Agreement and the consummation of the Sale of Majority Interest have been duly authorized by all necessary corporate action on the part of the Buyer. This Agreement has been duly executed and delivered by the Buyer, and assuming that this Agreement constitutes the valid and binding agreement of the Seller and the Company, constitutes the valid and binding obligation of the Buyer, enforceable in accordance with its terms.

Section 4.03   **Conflicts and Required Consents.** The execution and delivery of this Agreement and the consummation of the Sale of Majority Interest by the Buyer does not:

**(a)**    violate, conflict with or result in the breach or default of any provision of the Buyer's governing documents;

**(b)**    conflict with or violate any Law that is applicable to the Buyer; or

**(c)**    require any consent, approval, authorization or other order of, action by, registration or filing with or declaration or notification to any Government Agency or any other Person.

**Section 4.04    Litigation.** There is no Action pending against, or to the knowledge of Buyer, threatened against the Buyer before any court or arbitrator or any Government Agency, which would reasonably be expected to materially and adversely impact, or which seeks to prevent, enjoin, alter or materially delay Buyer's purchase of the Majority Interest.

**Section 4.05    Financial Condition of Buyer**. Buyer has cash on hand or borrowing facilities available to it at Closing in an amount sufficient to consummate the Sale of Majority Interest.

**Section 4.06    Commissions.** Neither the Buyer nor any its Affiliates has incurred, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or any similar charges in connection with this Agreement or the Sale of Majority Interest.

**Section 4.07    Securities Matters.** The Buyer is an "accredited investor" as that term is defined in Regulation D promulgated under the Securities Act of 1933, as amended. The Buyer acknowledges that the Interest have not been registered under such Securities Act and that the Company is not an investment company within the meaning of the Investment Company Act of 1940, as amended. The Buyer is acquiring the Interest for its own account for investment purposes only, and not with a view to or for resale in connection with any distribution thereof.

**ARTICLE 5.**
**[RESERVED]**

**ARTICLE 6.**
**ADDITIONAL COVENANTS**

**Section 6.01    Confidentiality; Public Disclosure.** The existence of this Agreement, the contents of this Agreement and any information provided to Buyer or its representatives pursuant to this Agreement shall be confidential  Except as may be required to comply with any applicable Law (including, without limitation, any disclosures necessary and proper in conjunction with the filing of any Tax Return or other document required to be filed in connection with making or obtaining any Permit), neither the Buyer nor the Seller shall, and the Seller shall cause the Company not to, issue any statement or communication to any third party, including customers (but excepting the respective counsel and financial advisors of the parties), regarding the subject matter of this Agreement or the Sale of Majority Interest, including, if applicable, the termination of this Agreement and the reasons therefor, without the consent of the Seller and the Buyer, which consent shall not be unreasonably conditioned, withheld or delayed.

**Section 6.02  Concurrent Transactions.** Effective on the Closing Date, Buyer and Seller shall cause to be formed a manager managed California limited liability company ("**Eleveur LLC**") for the purpose of owning and licensing the Trademark and concurrently therewith enter into an operating agreement substantially in the form of the Amended Operating Agreement of the Company ("**Eleveur Operating Agreement**"). Seller shall own 49% of the outstanding membership interests and Buyer shall own 51% of the outstanding membership interests. The Eleveur Operating Agreement shall provide Seller with an option at any time after the date that is the earlier to occur of (i) seven (7) years after the Closing Date and (ii) three (3) years and six (6) months after the occurrence of an MRW Trigger Event (as defined in the Amended Operating Agreement) to purchase outright Buyer's membership interest in Eleveur LLC at a purchase price equal to 1.8 times of net revenue from sales by the Company of wines sold under any and all SKUs using the Trademark or substantially similar derivatives thereof, as reflected on the financial records of the Company over the previous twelve (12) month period. Concurrently with the Closing, the Company and Eleveur LLC shall enter into a trademark license agreement for the license of the Trademark in the form attached hereto as Exhibit C ("**Trademark License Agreement**"), in connection with the sale and marketing of wine (the "**Trademark License**"). In consideration for the Trademark License, the Company shall pay Eleveur LLC a royalty equal to Two Percent (2%) of the Company's net income derived by the Company from the sale of wines sold under the Trademark, plus an additional annual payment of $1,000.00 (the "**Royalty**").

**Section 6.03  Intentionally deleted.**

**Section 6.04  Intentionally deleted.**

**Section 6.05  Filing Requirements.** Subject to the terms and conditions herein provided, each of the Buyer and the Company will take all actions necessary to comply in all material respects promptly with all legal requirements which may be imposed on it with respect to the consummation of the Sale of Majority Interest and will take all reasonable actions necessary to obtain (and will cooperate with the other parties hereto in obtaining) any consent, approval, order or authorization of, or any registration, declaration or filing with, any Governmental Agency or other entity, required to be obtained or made by it in connection with the taking of any action contemplated by this Agreement. Without limiting any other covenant or obligation of the Company hereunder, Seller agrees that he shall use commercially reasonable efforts to provide the Buyer with such information and such other assistance as may be reasonably required by the Buyer on written notice to the Seller, to enable the Buyer to obtain any and all approvals, permits and licenses as may be necessary or desirable with respect to the transactions herein required from any Government Agency having jurisdiction over the Buyer, the Company or the Sale of Majority Interest, including but not limited to any and all assistance required to enable Buyer to obtain any relevant federal, state, and local liquor licenses or other licenses or Permits required for the Buyer to make, produce, sell, or distribute alcoholic beverages and to otherwise to operate the business of the Company after the Closing.

(a)  **ABC Filing**.  Post-Closing, the Parties shall file an application and supplemental information with the California Alcohol Beverage Control ("**ABC**") seeking approval of the change in control of the Company in association with the Company's ABC Permits and appropriate application and supplemental information with the TTB and any other state other

31

than California where alcohol permits and registrations are necessary for Buyer to conduct the business of the Company after Closing (the "**Change in Control Applications**"). The Company shall bear all costs and expenses associated therewith.

**Section 6.06    Intentionally deleted**.

**Section 6.07    Reasonable Efforts**. As of the Closing, the Company shall have obtained all consents, waivers and approvals from, and provide all notices to, required to be obtained as a result of the transactions contemplated hereunder, by all Persons listed in Section 6.07 of the Disclosure Schedule (the "**Material Consents**"). All such consents, waivers, approvals and notices shall be in writing and in form and substance reasonably satisfactory to the Buyer, and executed counterparts of such consents, waivers and approvals shall be delivered to the Buyer promptly after receipt thereof, and copies of such notices shall be delivered to the Buyer promptly after the making thereof.

**Section 6.08    Non-Compete**.

**(a)**    In consideration for the Purchase Price, during the Restricted Period, without the prior written consent of the Company, which may be granted or withheld by the Company in its sole discretion, subject to the exclusions described below in this section, Seller shall not, directly or indirectly (i) own, engage in, manage, operate, control, establish or participate in the ownership, management, operation or control of, any entity, organization or individual that engages in any activity within the Target Area that is competitive to any reasonable extent with the Wine Business, or (ii) be a stockholder, agent, representative, partner, officer, director, joint venturer, member, manager, operator, employee, consultant or lender to any entity, organization or individual that engages in any activity within the Target Area that is competitive to any reasonable extent with the Wine Business. The following activities by Seller during the Restricted Period shall not be deemed a breach of this Non-Compete provision: (a) owning vineyards in whole or in part and selling grapes or bulk wine from such vineyards; (b) passive minority ownership of less than 15% of a business or company engaged in a wine industry related business; and (c) potential ownership of an events facility to be used primarily for weddings and that includes a tasting room area. Seller hereby acknowledges and agrees that this Section 6.08 is reasonable and valid in geographic and temporal scope and in all other respects.

**(b)**    If Seller or its agents breach or threaten to commit a breach of  this Section 6.08, the Company shall have all the rights and remedies available to the Company at law or in equity, including without limitation the right to have the covenants herein specifically enforced and the right to injunctive relief. If any court determines that any portion of such covenant is invalid, the remaining portions shall not thereby be affected and shall be given full effect, without regard to the invalid portion. Further, if Seller violates any of the restrictions in this Section 6.08, the Restricted Period shall be suspended and shall not run in favor of the Seller until such time that Seller cures the violation to the reasonable satisfaction of the Company, and the final date of the Restricted Period shall be deemed to be such date as would permit the Company to receive the benefit of the full time period comprising the Restricted Period.

Section 6.09   **No Cross-Promotion**. Unless otherwise agreed, the Company shall not promote Seller's businesses which are separate from the Company or Eleveur LLC, and shall not use the trademarks WINE SAFE and/or HOLY GRAIL in any of the Company's marketing materials, including but not limited to the SMS List Serve, the Email List Serve, and the Company website, and such existing references to these trademarks shall be removed from the website within thirty (30) days of Closing.

Section 6.10   **Shopify Capital Agreement and Lendspark Agreement**. Seller hereby covenants and agrees to pay off and satisfy in full, all of the Company's obligations under the Shopify Capital Agreement and Lendspark Agreement, identified in <u>Section 3.05(b)</u> of the Disclosure Schedule, within ten (10) days of Closing, using proceeds from the Purchase Price.

Section 6.11   **Further Assurances.**  Each party, upon the request from time to time of any other party hereto after the Closing, and at the expense of the requesting party but without further consideration, shall take such actions as may be necessary or reasonably requested to (i) consummate the transactions contemplated by this Agreement and the Ancillary Documents in an orderly fashion, and (ii) secure the recognition of the Buyer as the approved owner of the Company by any Governmental Agency as may be required by law.


# ARTICLE 7.
# CLOSING DELIVERIES

Section 7.01   **Seller Closing Deliveries.** At the Closing, the Seller shall deliver to Buyer the following:

**(i)**      instruments of conveyance reasonably required to deliver title in the Majority Interest to the Buyer from the Seller, including that certain membership unit assignment agreement evincing Seller's assignment of the Majority Interest to Buyer in the form attached hereto as Exhibit D (the "**Membership Unit Assignment Agreement**");

**(ii)**      evidence satisfactory to Buyer of receipt of the Material Consents, if any;

**(iii)**      a duly executed counterpart signature to this Agreement;

**(iv)**      A duly executed counterpart signature to the Amended Operating Agreement in the form attached hereto as <u>Exhibit B</u>;

**(v)**      A duly executed counterpart signature to the Eleveur Operating Agreement in the form attached hereto as <u>Exhibit E</u>;

**(vi)**      A duly executed counterpart signature to that certain agreement assigning the Company the right to use Seller's name and likeness in the form attached hereto as <u>Exhibit I</u> (the "**Name and Likeness Agreement**"); and

    **(vii)**  such other documents and instruments as the Buyer reasonably requests to consummate the sale of the Majority Interest.

  At Closing, the Seller shall deliver to the Company the following:

    **(i)**  A duly executed counterpart signature to the Hughes Consulting Agreement in the form attached hereto as <u>Exhibit F</u>; and

    **(ii)**  such other documents and instruments as the parties may reasonably requests to consummate the transactions contemplated hereby.

  **Section 7.02** **Buyer Closing Deliveries.** At the Closing, Buyer shall deliver to Seller the following:

    **(i)**  Delivery of the Initial Purchase Price;

    **(ii)**  A duly executed counterpart signature to this Agreement

    **(iii)**  A duly executed counterpart signature to the to the Eleveur LLC Operating Agreement;

    **(iv)**  A duly executed counterpart signature to the Amended Operating Agreement; and

    **(v)**  A duly executed counterpart signature to the Name and Likeness Agreement.

  At the Closing, the Buyer shall deliver to the Company the following:

    **(i)**  such other documents and instruments as the parties may reasonably requests to consummate the transactions contemplated hereby.

  **Section 7.03** **Company Closing Deliveries.** At the Closing, the Company shall deliver to Buyer and Seller the following:

    **(i)**  A duly executed counterpart signature to the Hughes Consulting Agreement;

    **(ii)**  a copy of the Trademark License Agreement, duly executed by the Company and Eleveur LLC in the form attached hereto as <u>Exhibit C</u>;

    **(iii)**  a copy of that certain trademark assignment agreement, whereby the Company assigns the Trademark to Eleveur LLC (the "**Trademark Assignment Agreement**"), duly executed by the Company and Eleveur LLC in the form attached hereto as <u>Exhibit G</u>;

    **(iv)**  a duly executed counterpart to this Agreement;

                    **(v)**      a duly executed counterpart to the Name and Likeness Agreement;
and

                    **(vi)**      such other documents and instruments as the parties may
reasonably requests to consummate the transactions contemplated hereby.


                                **ARTICLE 8.**
                                **[RESERVED]**

                                **ARTICLE 9.**
                                **INDEMNIFICATION**

**Section 9.01    Indemnification**.

              **(a)      Indemnification by Seller**.  Subject to the terms and conditions in this
Article 9, from and after the Closing Date, the Seller shall indemnify, defend, and hold harmless
the Buyer and its officers, directors, employees, agents, shareholders, Affiliates, and the Company
(each, a "**Buyer Indemnitee**") from and against, without duplication, any losses, damages, debts,
claims, litigation, proceedings, investigations, deficiencies, Actions, liabilities, obligations,
judgments, orders, awards, writs, injunctions, decrees, fines, penalties, Taxes, costs and expenses
(including reasonable legal, accounting and expert fees and expenses), including costs of enforcing
any right to indemnification hereunder and the cost of pursuing any insurance provider, but which
shall specifically not include consequential, special, indirect, punitive or exemplary damages
("**Damages**") incurred by any Buyer Indemnitee as a result of:

                    **(i)**      any inaccuracy or misrepresentation in, or breach of, any
representation or warranty of the Seller and/or Company contained in Articles 2 and 3 hereof;

                    **(ii)**      the breach of any covenant or agreement of the Company contained
in this Agreement;

                    **(iii)**      any and all taxes, including all penalties and interest associated
therewith, of the Company due and owing with respect to the period prior to the Closing Date,
including without limitation sales taxes. The Parties estimate such sales tax liability to be Eight
Hundred and Ten Thousand and No/100 Dollars ($810,000.00);

                    **(iv)**      any and all obligations of the Company due and owing with respect
to the Lendspark Agreement and Shopify Capital Agreement disclosed in Section 3.05(b) of the
Disclosure Schedule;

                    **(v)**      any and all claims and disputes arising from the Vintage Wine
Estates bankruptcy settlement and subsequent dispute relating to Seller's name, image, and
likeness (the "**Hughes Persona**"), excluding any trademark claims, as more particularly
identified and described in Section 3.11(e) of the Disclosure Schedule. For the avoidance of
doubt, such excluded trademark claims described herein do not include claims related to the

                                        35

Trademark or any of the Company's trademarks, including those described in <u>Section 3.11(a)</u> of the Disclosure schedule;

        **(vi)**     any and all claims and disputes arising from the Company's non-compliance with State direct wine shipping laws as more particularly identified and described in <u>Section 3.13</u> and <u>3.14</u> of the Disclosure Schedule; and

        **(vii)**     any broker and/or finder's fee, to the extent unpaid.

The indemnification obligations set forth in this Section shall survive the termination of this Agreement or the Closing, as applicable.

        **(b)**     **Intentionally deleted**.

        **(c)**     **Indemnification by Buyer**.  Subject to the terms and conditions set forth in this <u>Article 9</u>, from and after the Closing Date, the Buyer shall indemnify the Seller and their respective officers, directors, employees, agents, shareholders and Affiliates (each, a "**Seller Indemnitee**"), and hold each of them harmless, from and against, without duplication, any and all Damages incurred by any Seller Indemnitee as a result of:

        **(i)**     any inaccuracy or misrepresentation in, or breach of, any representation or warranty made by the Buyer in <u>Article 4</u> hereof; or

        **(ii)**     any failure by the Buyer to perform or comply with any covenant or agreement in this Agreement to be performed or complied with by the Buyer.

     The indemnification obligations set forth in this Section shall survive the termination of this Agreement or the Closing, as applicable.

     **Section 9.02   Claim Notice.** Upon obtaining knowledge of any item of Damages which has given rise to, or could reasonably give rise to, a claim for indemnification or reimbursement hereunder (a "**Claim**"), the Person entitled to indemnification or reimbursement hereunder (the "**Indemnified Party**") shall, as promptly as reasonably practicable after obtaining such knowledge, give written notice of such Claim (a "**Claim Notice**") to the Person responsible for providing indemnification or reimbursement hereunder (the "**Indemnifying Party**"). Any Claim Notice originating from the Buyer shall be delivered to the Seller. The Claim Notice shall include a statement of the facts underlying the Claim, an indication of whether the Indemnified Party has paid or incurred Claims, the date when such Claims were paid or incurred, the nature of the basis for indemnification or reimbursement therefor, a good faith estimate of the amount of the claim (or, if it is not practicable to determine such estimate, the amount proposed in good faith to be reserved with respect to such claim), and all material facts related to such Claims. The Indemnified Party shall furnish to the Indemnifying Party in good faith and in reasonable detail such information as the Indemnified Party may have with respect to such indemnification or reimbursement claim (including copies of any summons, complaint or other pleading which may have been served on it and any written claim, demand, invoice, billing or other document evidencing or asserting the same). No failure or delay by the Indemnified Party in the performance of the foregoing shall reduce or otherwise affect the indemnification or reimbursement obligations hereunder, except to the extent that such failure or delay shall have adversely affected the

Indemnifying Party's ability to defend against, settle or satisfy any liability, damage, loss, claim or demand for which the Indemnified Party is entitled to indemnification or reimbursement hereunder.  Except as expressly provided to the contrary in this Agreement, the representations, warranties, covenants, and agreements of the Parties made in this Agreement shall survive the Closing.  Notwithstanding the foregoing, the right to bring an indemnity claim hereunder shall terminate at 5:00 p.m. Pacific time on the fifteen (15) month anniversary of the Closing Date; provided, however, that the foregoing limitation shall not apply with respect to any breach caused by the Seller's fraud and/or intentional misrepresentations, which claims shall be subject to the applicable statute of limitations, nor shall such limitation apply to any claim related to a Fundamental Representation as defined in Section 9.05(a) below.  Further, except as otherwise provided in this Agreement, indemnification pursuant to this Section 9.3 shall be Buyer's sole and exclusive remedy for any breach of any representation, warranty, covenant or other provision contained in this Agreement or in any certificate or document delivered pursuant hereto, or any other matter relating to or arising out of this Agreement and the transaction contemplated hereby.

**Section 9.03    Objections to Claims; Resolution of Conflicts.**

(a)    The Indemnifying Party shall have the right to object to one or more of the claims set forth in any Claim Notice delivered by the Indemnified Party by serving written notice thereof to the Indemnified Party within thirty (30) days following the delivery of such Claim Notice, which notice shall specify in reasonable detail the basis for such objection. In the event that the Indemnifying Party does not object to a claim in accordance with the preceding sentence by the close of business on the thirtieth (30th) day following receipt by the Indemnifying Party of the Claim Notice, the Indemnifying Party shall be deemed to have accepted and agreed to the claim set forth in such Claim Notice, and shall be precluded from raising any objection thereto following such date.

(b)    In case the Indemnifying Party shall so object in writing to any claim or claims by the Indemnified Party made in any Claim Notice, the Indemnified Party shall have thirty (30) days after receipt of an objection by the Indemnifying Party to respond thereto in a written statement to the Indemnifying Party. If after such thirty (30) day period there remains a dispute as to any claims, the Indemnifying Party and the Indemnified Party shall attempt in good faith for thirty (30) days to agree upon the rights of the respective parties with respect to each of such claims. If the Indemnifying Party and the Indemnified Party should so agree, the claims set forth in such Claim Notices shall be modified as necessary to reflect such agreement.

(c)    If no such agreement can be reached after good faith negotiation during such thirty (30) day period, either the Indemnified Party or the Indemnifying Party may pursue any and all legal remedies available to such party in accordance with this Agreement.

**Section 9.04    Third-Party Claims.** If any claim set forth in the Claim Notice given by the Indemnified Party pursuant to Section 9.02 hereof is based on a Claim asserted by a third party (a "**Third-Party Claim**"), the provisions of this Section 9.04 shall govern. The Indemnifying Party has the right, exercisable by written notice as provided below, to assume and conduct the defense of such Third-Party Claim with counsel reasonably acceptable to the Indemnified Party.  The Indemnifying Party shall have thirty (30) days after the date that the Claim Notice is given by the Indemnified Party to notify the Indemnified Party in writing of the Indemnifying Party's election

to defend such Third-Party Claim on behalf of the Indemnified Party. If the Indemnifying Party elects to defend such Third-Party Claim, the Indemnified Party shall make available to the Indemnifying Party and its agents and representatives all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control as is reasonably required by the Indemnifying Party and shall otherwise cooperate with and assist the Indemnifying Party in the defense of such Third-Party Claim, and so long as the Indemnifying Party is defending such Third-Party Claim in good faith, then Indemnified Party shall not pay, settle or compromise such Third-Party Claim. The Indemnifying Party, if it has assumed the defense of any Third-Party Claim as provided in this Agreement, may not, without the prior written consent of the Indemnified Party, consent to a settlement of, or the entry of any judgment arising from, any such Third-Party Claim that (i) does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party of a complete release from all liability in respect of such Third-Party Claim, or (ii) grants any injunctive or equitable relief of any kind. If the Indemnifying Party elects to defend such Third-Party Claim, then Indemnified Party shall have the right to participate in the defense of such Third-Party Claim, at the Indemnified Party's own expense (subject to reimbursement for expenses that constitute Claims pursuant to this Article 9). If the Indemnifying Party does not elect to defend, or fails in a material respect to defend, such Third-Party Claim, then the Indemnified Party shall have the right, in addition to any other right or remedy it may have hereunder, to defend such Third-Party Claim (including the right to settle such Third-Party Claim), and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense. The Indemnifying Party or the Indemnified Party, as the case may be, has the right to participate in (but not control), at its own expense, the defense of any Third-Party Claim that the other is defending as provided in this Agreement.

**Section 9.05  Limitations.** Except as otherwise referenced in Section 10.10, notwithstanding anything else to the contrary:

(a)  Except as otherwise provided herein, Seller's indemnity obligations hereunder shall be subject to a cap of 15% of the Purchase Price ("**CAP**") and shall be triggered only for claims in excess of .05% of the aggregate net Purchase Price (the "**Basket**"), and Seller will only be liable for claims in excess of the Basket; provided that no deductible or Basket will apply to the Fundamental Representations (defined below) and the cap on liability in respect of the breach of Fundamental Representations shall equal the Purchase Price; provided, further, that the foregoing CAP shall not apply with respect to any breach caused by the Seller's fraud and/or intentional misrepresentations. As used herein, "**Fundamental Representations**" means all representations and warranties in respect of Sections 3.01, 3.03, 3.04, 3.06, 3.11, and 3.25. Notwithstanding the above, the Basket and CAP shall not apply to Seller's indemnification obligations under Sections 9.01(a)(iii)-(vii), and any liability of Seller under such Sections shall be excluded from the calculation of the CAP.

(b)  The amount of any Damages that may otherwise be payable under this Article 9 shall be reduced by (i) any reimbursements or other amounts to which the Buyer or anyone claiming by or on behalf of the Buyer (collectively the "**Buyer Group**"), the Seller or anyone claiming by or on behalf of Seller (collectively, the "**Seller Group**") or the Company actually receives from third parties, and (ii) any insurance proceeds to which the Buyer, Seller, any other member of the Buyer Group or Seller Group or Company actually receive in connection

with such item of Damages. Each Indemnified Party shall use all commercially reasonable efforts to mitigate any Damages which may be subject to a claim for reimbursement or indemnification hereunder, including the reasonable and prudent prosecution and/or settlement of any litigation, as a plaintiff, defendant or counterclaimant. If the Buyer Group receives any such reimbursements, insurance proceeds or other recoupment after a payment which relates thereto, the Buyer shall promptly deliver to the Seller such amount of the indemnification payment as would not have been paid to the Buyer had the reimbursements or insurance proceeds reduced the original payment.

(c)     Seller shall not have, and shall not exercise or assert (or attempt to exercise or assert), any right of contribution, right of indemnity, or other right or remedy against the Company in connection with any indemnification obligation or any other liability to which Seller may become subject under or in connection with this Agreement or the related facts and circumstances underlying any such indemnification obligation or other liability.

(d)     No Damages shall be payable under Article 9 by any Indemnified Party in respect of any amounts that were settled as part of the calculation of the WC Adjustment pursuant to Section 1.05, and that may otherwise have constituted Damages hereunder.

# ARTICLE 10.
# GENERAL PROVISIONS

**Section 10.01  Notices.** All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial messenger or courier service, or mailed by registered or certified mail (return receipt requested) or sent via facsimile (with acknowledgment of completed transmission) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice); *provided, however*, that notices sent by mail will not be deemed given until received:

|  |  |
|---|---|
| If to the Company or the Seller, to: | Cameron Hughes<br>2183 Pacific Avenue<br>San Francisco, CA 94115<br>415-215-0054<br>Email: ch@denegoce.com |
| With a copy to: | Reidy Law Group<br>1230 Spring Street<br>St. Helena, CA 94574<br>Attn:  Dan Reidy<br>Email:  dan@reidylawgroup.com |

|  |  |
|---|---|
| If to the Buyer, to: | Martin Ray Winery, Inc. |
| | 2191 Laguna Road |
| | Santa Rosa, CA 95401 |
| | 707-543-7199 |
| | Email: Courtney@martinraywinery.com |
| | Attn: Courtney Benham |
| | |
| With a copies to: | Carle, Mackie, Power & Ross LLP |
| | 100 B Street, Ste. 400 |
| | Santa Rosa, A 95401 |
| | 707-526-4200 x116 |
| | Email: pkalsched@cmprlaw.com |
| | Attn: Phillip Kalsched |

**Section 10.02 Interpretation.** The words "**include**," "**includes**," and "**including**" when used herein shall be deemed in each case to be followed by the words "**without limitation**." The words "**hereof**," "**herein**," "**hereby**," "**hereunder**" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. Article, section, subsection, exhibit, and schedule references are to this Agreement unless otherwise specified. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever used herein, the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to both genders. All references to monetary amounts are to currency of the United States of America. If performance hereunder is due on any date which falls on a Saturday, Sunday or a bank or legal holiday, such due date shall be extended until the next succeeding Business Day.

**Section 10.03 Disclosure Schedule.** The Disclosure Schedule is arranged in sections corresponding to the numbered and lettered sections contained in this Agreement.

**Section 10.04 Amendment and Waivers.** Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed (in the case of an amendment) by all of the parties hereto or (in the case of a waiver) by the party against whom the waiver is to be effective. No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

**Section 10.05 Entire Agreement; No Assignment; Third Party Beneficiaries.** This Agreement, the Exhibits hereto, the Disclosure Schedule, and other documents and instruments among the parties hereto referenced herein (a) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements and understandings both written and oral, among the parties with respect to the subject matter hereof, (b) shall not be assigned without the prior written consent of the Buyer, on the one hand, and the Seller, on the other hand; and (c) shall be binding upon and inure to the benefit of the parties hereto and their and its respective successors and assigns.

**Section 10.06 Severability.** In the event that any provision of this Agreement or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

**Section 10.07 Governing Law.** This Agreement shall be governed by and construed in accordance with the Laws of the United States of America and the State of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

**Section 10.08 Representation.** The parties acknowledge and agree that they have been represented by counsel during the negotiation, execution and performance of this Agreement and, therefore, waive the application of any Law providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual agreement, and this Agreement shall not be deemed to have been prepared by any single party hereto.

**Section 10.09 Expenses.** Whether or not the Sale of Majority Interest is consummated, each party hereto is solely responsible for all fees and expenses that such party incurs in connection with the negotiation and effectuation of the terms and conditions of this Agreement and the consummation of the Sale of Majority Interest, except with respect to claims for Damages incurred as a result of a material breach of this Agreement.

**Section 10.10 Dispute Resolution**. If any dispute arises under this Agreement, the parties shall first use their best efforts to reach agreement on the matters in dispute under the terms herein. If such efforts do not resolve the dispute, either Party may commence litigation in Superior Court, County of Sonoma. In the event of any such commencement of litigation, the prevailing party shall be entitled to recover from the other party such costs and reasonable attorneys' fees as may have been incurred, including expert witness fees and costs of appeal; but such fees shall not be available to the prevailing party if it does not first participate in good faith negotiations as described herein.

**Section 10.11  Counterparts.** This Agreement may be executed in one or more counterparts (including facsimile and other electronically transmitted counterparts), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.  This Agreement and any other transaction document, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, portable document format or other electronic transmission (including any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com), will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  Any such signature page will be effective as a counterpart signature

page hereto without regard to page, document or version numbers or other identifying information thereon, which are for convenience of reference only.  At the request of any party hereto or to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such contract will raise the use of a facsimile machine, portable document format or other electronic transmission (including any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine, portable document format or other electronic transmission (including any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) as a defense to the formation of a contract and each such party forever waives any such defense.

*[Remainder of page intentionally left blank]*

Each party has caused this Membership Interest Purchase Agreement to be duly executed personally or by its duly authorized officer or representative on the date first above written.

**COMPANY:**       Phoenix Wine Company, LLC,
a California limited liability company

By _Cameron Hughes_
DFE8E5D854E147B...
Name: Cameron Hughes
Title:  Member

**BUYER:**        Martin Ray Winery, Inc.,
a California corporation

By _COURTNEY BENHAM_
DA08A4F28F5E429...
Name: Courtney Benham
Title:  Owner

**SELLER:**

_Cameron Hughes_
DFE8E5D854E147B...
Cameron Hughes, an individual

*[Signature page to Membership Interest Purchase Agreement]*

**Exhibit A**

**Working Capital Accounting Principles**

Except as specifically required by the notes below, amounts will be calculated in accordance with GAAP.   All measurements below will be conducted as of the Closing Time.

(1) Cash - for the avoidance of doubt, "Cash" will be calculated in accordance with the definition thereof, and will thereby include the appropriate amounts in the accounts of the Company but the calculation of the Cash amount will be reduced by checks issued and uncashed as of the time of calculation (and for the avoidance of doubt, may result in a negative amount for calculating Cash if the amount of the uncleared checks exceeds the other Cash of Company).   Cash is excluded from the calculation of Working Capital.

(2) Accounts Receivable will be comprised of the following:

- Accounts receivable of the Company, as adjusted for reserves for doubtful receivables, deductions and other related adjustments in conformity with past practices.

- Accounts receivable of the Company pertaining to other receivables, partner receivables, and as adjusted for reserves for doubtful receivables, deductions and other related adjustments in conformity with past practices.

(3) Inventory will be comprised of the following:

- Supplies inventory of the Company including but not limited to all packaging materials useable on currently sold products, bottles, labels for product currently sold, corks, capsules, seals, and tasting room merchandise and supplies currently sold and point of sale materials related to products currently sold as adjusted by the application of appropriate reserves based upon the physical inspection and past practices.

(4) Prepaid Expenses (prepaid insurance, prepaid property taxes and) of the Company will be calculated based on the amounts of days (or months) of services remaining divided by the total period times the amount paid for such services following past practices.

(5) Accounts Payable - accounts payable will be comprised of accounts payable of the Company that are less than [120] days past due.  All accounts payable more than 60 past due will be considered as part of Indebtedness.

- For the avoidance of doubt, any checks outstanding that reduce "Cash" shall also correspondingly reduce the accounts payable.

(6) Accrued Liabilities will be comprised of the following:

- Sales tax payable of the Company outstanding at the day of close calculated in conformity with past practices.

- Sales tax liability of the Company outstanding at the day of close calculated in conformity with past practices.

- Accrued payroll taxes of the Company outstanding at the day of close calculated in conformity with past practices.

- FICA Employee of the Company outstanding at the day of close calculated in conformity with past practices.

- FICA – Other of the Company outstanding at the day of close calculated in conformity with past practices.

- Medicare Employee of the Company outstanding at the day of close calculated in conformity with past practices.

- Medicare - Other of the Company outstanding at the day of close calculated in conformity with past practices.

- State withholding of the Company outstanding at the day of close calculated in conformity with past practices.

- Federal withholding of the Company outstanding at the day of close calculated in conformity with past practices.

- Workman's Comp of the Company outstanding at the day of close calculated in conformity with past practices.

DocuSign Envelope ID: 0755C7A4-73B1-41D8-9627-3EF4E1630D65

**Exhibit B**

**Amended Operating Agreement**

**[See attached]**

*See Tab 2*

**Exhibit C**

**Trademark License Agreement**

**[See attached]**

*See Tab 3*

DocuSign Envelope ID: 0755C7A4-73B1-41D6-9627-3EF4E1630D65

**Exhibit D**

**Membership Unit Assignment Agreement**

**[See attached]**

*See Tab 4*

**Exhibit E**

**Eleveur Operating Agreement**

**[See attached]**

*See Tab 5*

**Exhibit F**

**Hughes Consulting Agreement**

**[See attached]**

*See Tab 7*

**Exhibit G**

**Trademark Assignment Agreement**

**[See attached]**

*See Tab 8*

**Exhibit H**

**Held Back Inventory**

**[See attached]**

| SKU | Name | Vintage | Actual | Cost/Case | Total Cost | Sell Price/Case | Bottle Price | Phoenix Margin | DN website price | Suggested Retail Price | Retail Margin @ Suggested |
|-----|------|---------|--------|-----------|------------|-----------------|--------------|----------------|------------------|------------------------|---------------------------|
| BTL.OG0161 | de Negoce N.161 Petite Sirah, Walla Walla Valley | 2018 | 194 | 56.05 | 10,874 | 60.00 | 5.00 | 7% | 14.00 | 10.00 | 50% |
| BTL.OG0095 | de Negoce N.95 MERLOT ALEXANDER VALLEY | 2018 | 383 | 65.05 | 24,916 | 100.00 | 8.33 | 35% | 20.00 | 16.00 | 48% |
| | | | | | | | | | | | |
| | Lot 367 2018 Russian River Valley Chardonnay (converted shiners) | 2018 | 1500 | 35.00 | 52,500 | $60 | 5.00 | 42% | 15.00 | 12.00 | 58% |
| BTL.OG0207 | de Negoce N.207 CHARD Willamette Valley | 2019 | 1963 | 54.21 | 106,414 | 80.00 | 6.67 | 32% | 18.00 | 14.00 | 52% |
| BTL.OG0091 | de Negoce N.91 CAB SAUV WALLA WALLA | 2018 | 1079 | 87.05 | 93,931 | 120.00 | 10.00 | 27% | 19.00 | 16.00 | 38% |
| | | | | | | | | | | | |
| | | | | | 288,635 | | | | | | |

**Exhibit I**

**Name and Likeness Agreement**

**[See attached]**

*See Tab 6*

DocuSign Envelope ID: 0755C7A4-73B1-41D8-9627-3EF4E1630D65

**Exhibit J**

**Disclosure Schedule**

**[See attached]**

*See Tab 9*