SPENCER HOSIE (CA Bar No. 101777)
shosie@hosielaw.com
DIANE S. RICE (CA Bar No. 118303)
drice@hosielaw.com
DARRELL R. ATKINSON (CA Bar No. 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
149 New Montgomery Street, 4th Floor
San Francisco, CA 94105
(415) 247-6000 Tel.

Attorneys for Plaintiffs
MARTIN RAY WINERY, INC. and
PHOENIX WINE COMPANY, LLC

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

<table>
<tr><td>

MARTIN RAY WINERY, INC.,
a California corporation, PHOENIX WINE
COMPANY, LLC, a California limited liability
company,

       Plaintiffs,

vs.

CAMERON HUGHES, an individual, THE
NÉGOCIANT, a business organization, form
unknown, and DOES 1-10, inclusive,

       Defendant(s).

_____

CAMERON HUGHES, an individual,

       Counterclaimant,

vs.

MARTIN RAY WINERY, INC.,
a California corporation, and ROES 1-50,
inclusive,

       Counter-Respondents.

_____

</td><td>

Case No.: 4:25-cv-2925-JST

**PLAINITFFS' NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION; MEMORADUM IN
SUPPORT**

Date: August 21, 2025
Time: 2 p.m.
Judge: Hon. Jon S. Tigar
Courtroom: 6, 2nd Floor
Complaint Filed: March 28, 2025
Trial Date: None Set

**JURY TRIAL DEMANDED**

</td></tr>
</table>

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

# TABLE OF CONTENTS

**Page**

I.    ISSUE TO BE DECIDED AND INTRODUCTION ...........................................................3

II.   STATEMENT OF FACTS ...........................................................................................3

    A.    Martin Ray's Business and Trademarks .........................................................3

    B.    Hughes' Wine Business ................................................................................4

    C.    The Non-Compete Agreement .....................................................................5

    D.    Defendants' Unlawful Conduct ....................................................................6

III.  ARGUMENT ..........................................................................................................6

    A.    The Standard for Granting a Preliminary Injunction ......................................7

    B.    Given the Clear and Irrefutable Evidence Against Defendants, a Preliminary
         Injunction is Appropriate and Just in This Case ...........................................7

         1.    Martin Ray is likely to succeed on its claims for Trademark Infringement
               under Sections 1114 and 1125(a) as to Both Marks-in-Suit ...........................7

               a.    Ownership and Validity of the Marks-in-Suit ..................................8

               b.    Likelihood of Confusion ................................................................8

         2.    Martin Ray is likely to succeed on its claim for Cybersquatting under
               Section 1125(d)-Standard DE NÉGOCE Mark ...........................................16

         3.    Martin Ray is likely to succeed on its claim for Breach of Non-Compete ...18

               a.    The Non-Compete is Reasonable and So Valid and Enforceable.....18

               b.    Hughes Breached the Non-Compete................................................20

    C.    Martin Ray Will Suffer Irreparable Harm Absent a Preliminary Injunction ...........23

    D.    The Balance of Hardships/Equities Tips Sharply in Martin Ray's Favor ...............24

    E.    The Public Interest Favors a Preliminary Injunction .............................................25

    F.    No Bond Should be Required .................................................................................25

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

**TABLE OF AUTHORITIES**

**Cases**                                                                                           **Page(s)**

*Biomax Health Products LLC v. Perfectx USA*,
    No. 23-cv-02834-SI, 2023 WL 4477210 (N.D. Cal. Jul. 11, 2023) ........................... 7, 24, 25

*BNSF Ry. Co. v. Float Alaska IP*, LLC,
    No. 2:23-cv-03934-MCS-JC, 2023 WL 6783506  (C.D. Cal. Aug. 28, 2023)...... 9, 15, 16, 25

*City & County of San Francisco v. City of Oakland*,
    No. 24-cv-02311-TSH, 2024 WL 4775737 (N.D. Cal. Nov. 12, 2024) .............................. 15

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011) ........................................................................................ 25

*Digby Adler Group LLC v. Image Rent a Car, Inc.*,
    79 F. Supp. 3d 1095 (N.D. Cal. 2015) ..........................................................................16-17

*Intel Corp. v. Am. News Intel Pub., LLC*,
    No. C 09–05085 CRB, 2010 WL 2740063 (N.D. Cal. Jul. 12, 2010) ............................17-18

*JL Beverage Co., LLC v. Jim Beam Brands Co.*,
    828 F.3d 1098 (9th Cir. 2016) ........................................................................................ 13

*Niantic, Inc. v. Global++*,
    No. 19-cv-03425-JST, 2019 WL 8333451 (N.D. Cal. Sep. 26, 2019) ............................ 7, 25

*Novus Optimum Labs v. Tamayo*,
    No. 13-cv-01119-JST, 2013 WL 3354566 (N.D. Cal. Jul 2, 2013)...................... 7, 16, 17, 23

*Ocean Beauty Seafoods, LLC v. Pacific Seafood Gr'p.*,
    648 Fed. App'x 709 (9th Cir. 2016) ................................................................................ 24

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*,
    396 F.3d 1369 (Fed. Cir. 2005)....................................................................................... 10

*Rebecca Bamberger Works, LLC v. Bamberger*,
    No. 24-CV-706 JLS (DDL), 2024 WL 2805323  (S.D. Cal. May 31, 2024) ................. et seq.

*Seed Services, Inc. v. Winsor Grain, Inc.*,
    868 F.Supp.2d 998 (E.D. Cal. 2012)....................................................................... 11, 24, 25

*Stark v. Diageo Chateau & Estate Wines Co.*,
    907 F. Supp. 2d 1042 (N.D. Cal. 2012) .......................................... 7, 8, 9, 11, 12, 15, 16

*Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*,
    No. C 05–0587 MHP, 2005 WL 701599 (N.D. Cal. Mar. 23. 2005) .............. 9, 10, 14, 15, 16

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

ii

*Yelp Inc. v. Catron*,
    70 F. Supp. 3d 1082 (N.D. Cal. 2014) ................................................................ 16

*Zobmondo Entertainment, LLC v. Falls Media, LLC*,
    602 F.3d 1108 (9th Cir. 2010) ............................................................. 11, 12, 13

## Statutes

15 U.S.C. § 1114 ..................................................................................................... 7
15 U.S.C. § 1115(a) ................................................................................................. 8
15 U.S.C. § 1125(a) ................................................................................................. 7
15 U.S.C. § 1125(d) ........................................................................................... 6, 17
Fed. R. Civ. P. 65(c) ............................................................................................. 25
California Business & Professional Code § 16601 ....................................18, 19, 20

## Miscellaneous

4 McCarthy on Trademarks & Unfair Competition, § 25A:51 (5th ed. 2025) ................................. 18

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

1

## <u>NOTICE OF MOTION AND MOTION</u>

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on August 21, 2025, at 2:00 p.m., or as soon thereafter as

4

counsel may be heard in Courtroom 6, on the 2nd Floor of the Oakland Courthouse for the United

5

States District Court for the Northern District of California, located at 1301 Clay Street, Oakland,

6

CA 94612, the Honorable Jon S. Tigar presiding, Plaintiffs Martin Ray Winery, Inc. ("MRW") and

7

Phoenix Wine Company, LLC ("Phoenix") (collectively "Plaintiffs" or "Martin Ray") will, and

8

hereby do move the Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure

9

65, restraining and enjoining Defendants Cameron Hughes ("Hughes"), The Négociant, and Does 1

10

through 10 (collectively the "Defendants") and Defendants' officers, agents, servants, and

11

employees, and all persons in active concert or participation with them who receive actual notice of

12

the Court's order (the "Defendants' Participants").

13

Plaintiffs seek an order restraining and enjoining Defendants and Defendants' Participants

14

from: (1) infringing the DE NÉGOCE Marks; (2) cybersquatting on the Standard DE NÉGOCE

15

Mark; (3) breaching the Non-Compete; (4) using the terms "de négoc," "de negoce," "the

16

négociant," "the negociant," or any similar term or phrase in relation to wine; (5) using The

17

Négociant Website and/or Domian Name; (6) sourcing or otherwise developing, offering to sell,

18

selling, marketing or otherwise promoting wine or a wine business direct-to-consumers (or

19

preparing to do the same) for eleven months; (7) sourcing or otherwise developing, offering to sell,

20

selling, marketing or otherwise promoting wine or a wine business to wholesalers, distributors, or

21

retailers (or preparing to do the same) for eleven months; (8) doing any acts that are likely to

22

confuse, mislead, or deceive anyone into believing that Defendants continue to be associated with

23

Plaintiffs or the de Négoce brand; (9) destroying any products, advertising, documents, or other

24

material with the terms "de négoc," "de negoce," "the négociant," "the negociant," or any similar

25

26

27

28

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

term or phrase; (10) destroying any evidence relevant to this action; and (11) participating or assisting in any such activity.  (The terms DE NÉGOCE Marks, Standard DE NÉGOCE Mark, Stylized DE NÉGOCE Mark, Non-Compete, The Négociant Website, and The Négociant Domian Name are defined in the accompany Memorandum.)

Plaintiffs also respectfully requests that the Court schedule a hearing on this Motion at the Court's earliest convenience.  In addition, Plaintiffs respectfully request that the Court order Defendants to: (1) provide notice of the Court's order to Defendants' Participants within three (3) court days of the Order; and (2) file sworn declarations with the Court detailing the manner in which they are complying with the Order within seven (7) court days of the Order.

Plaintiffs' Motion is based on its: First (15 U.S.C. § 1114, Standard DE NÉGOCE Mark); Second (15 U.S.C. § 1114, Stylized DE NÉGOCE Mark); Fourth (5 U.S.C. § 1125(a), Standard DE NÉGOCE Mark); Fifth (15 U.S.C. § 1125(a), Stylized DE NÉGOCE Mark); Sixth (5 U.S.C. § 1125(d), Standard DE NÉGOCE Mark); and Thirteenth (Breach of Contract), Claims for Relief. *See* First Am. Comp. (ECF 21), § VII.[1]

Plaintiffs' Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the declarations and exhibits filed in support of this Motion, any Reply papers filed in support of this Motion, any oral argument, all pleadings and papers on file in this action, and such other and further matters as the Court may consider.

---

[1] As to Claim No. 13, this Motion is more specifically based on non-compete violations.

Hosie Rice llp
149 New Montgomery Street, 4th Floor
San Francisco, CA 94105

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.      ISSUE TO BE DECIDED AND INTRODUCTION.**

The question here is whether a preliminary injunction should issue prohibiting Defendants' violations of the Lanham Act and a contractual non-compete clause.  An injunction should issue:

Plaintiff MRW bought Plaintiff Phoenix, including Phoenix's goodwill and trademarks, from Defendant Hughes.  As part of this transaction Hughes committed not to compete with Phoenix where it does business (the U.S.) for 21 months.

Phoenix sells wine.  More specifically, Phoenix employs a business model whereby it eschews owning its own vineyards and instead buys the excess wine of others, which it may rebled, bottle, and sell under its own label direct-to-consumers online.  In this way Phoenix can sell high quality wines at a lower price point to consumers than the wineries it secures bulk wine from.  Relevant to this action, Phoenix owns two federally registered trademarks, a standard character mark and a stylized mark, both for the phrase "de Négoce," as applied to wine.  Phoenix markets and sells its wine under the de Négoce brand name and has enjoyed great success doing so.

Mere months after selling Phoenix, Hughes began work on and then launched a direct Phoenix competitor.  Hughes called his new wine venture "The Négociant."  The Négociant has a direct-to-consumers website at the domain name: thenegociantwine.com.  Hughes' The Négociant venture is a blatant rip-off of his prior de Négoce business.  Hughes' conduct violates his non-compete, has infringed Plaintiffs' marks, and constitutes continued cybersquatting.

A preliminary injunction is necessary here to preserve the goodwill in the very business and marks MRW just acquired from Hughes.  If Hughes wanted to own de Négoce, he should not have sold it.  Yet he did, happily pocketing the $12.5 million MRW paid him.

**II.      STATEMENT OF FACTS.**

**A.      Martin Ray's Business and Trademarks.**

MRW is a successful and well-regarded Sonoma based wine business, which sells wine under the Martin Ray Winery label. Martin Ray Winery wine is made by the Martin Ray Winery, which grows and presses grapes. MRW is run by Courtney Benham ("Benham"), a wine entrepreneur with a storied California wine industry career. Benham has been expanding the MRW family of wines. To that end, MRW acquired Phoenix and its de Négoce wine brand from Hughes.

Phoenix's sells wine under the de Négoce brand. *See* Benham Dec., ¶ 5. Phoenix does not own a vineyard. Instead, the Phoenix business model is based on the acquisition of excess wine from others, which may be re-blended, and then sold by Phoenix under its de Négoce label for a lower price than what the vineyards it acquires wine from typically sell their bottles. *See id.* In this way, the de Négoce brand, a non-vineyard owning label, is distinct from its vineyard owning sibling label Martin Ray Winery.

Phoenix sells de Négoce direct-to-consumers through its website: www.denegoce.com. In a roughly five-year period, Phoenix's sales were over $60 million. de Négoce wine is sold under U.S. Trademark Reg. Nos. 6,637,777 (the "Standard DE NÉGOCE Mark") and 6,637,778 (the "Stylized DE NÉGOCE Mark"), and the de Négoce website includes numerous images of wines labelled with these marks. *Compare* Exs. 1-2 (mark registrations) *with id.*, Exs. 3-4 (exemplary website images).[2] The "Standard DE NÉGOCE Mark" and the "Stylized DE NÉGOCE Mark" are referred to herein collectively as the "DE NÉGOCE Marks" or the "Marks-in-Suit."

## B. Hughes' Wine Business.

Hughes is also a California wine entrepreneur. In 2001 he established a label that used his name, Cameron Hughes Wine. That company did not own vineyards or production facilities, which provided flexibility and low overhead to produce wines at competitive prices. Despite initial success, Hughes' first company faced financial difficulties, was placed into receivership, and was

---

[2] All "Ex." references are to the Atkinson Dec. not the Benham Dec.

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

eventually acquired by a party not relevant here.  *See* Ex. 5 at 2.  In 2020, Hughes returned to the wine business with a new company, Phoenix.  Under Hughes, Phoenix acquired excess wine from wineries, re-blended it, and marketed it under the de Négoce label.  Hughes sold Phoenix to MRW and in so doing entered into a non-compete.  In 2025, Hughes again returned to the wine business. He did so with a company—Defendant The Négociant—that uses a non-vineyard owning label model, the same business model he used for his prior two ventures.

**C.**    **The Non-Compete Agreement.**

In two tranches Hughes sold the de Négoce business, including goodwill and trademarks, to MRW.  This was accomplished by the sale of Phoenix.  In January 2023, pursuant to a "Membership Interest Purchase Agreement" ("MIPA"), MRW acquired a 51% interest in Phoenix. *See* Ex. 6 (MIPA) at Recital B & § 1.01.  In September 2023, pursuant to an "Agreement and Release in Full of All Claims and Rights" ("Release"), MRW acquired the remaining 49% of Phoenix.  *See* Ex. 7 (Release) at Recital B & § 1(b).  All-in, MRW paid $12.5 million for the de Négoce business.[3]

The MIPA contains a non-compete provision, which was amended by the Release (the "Non-Compete").  *See* MIPA, § 6.08 & Release, § 1(c).  The Non-Compete prohibits Hughes from, "directly or indirectly," during the "Restricted Period," partaking in or preparing to partake in a "Wine Business" within "the areas in which [Phoenix] actively conducts business."  The Restricted Period is 21 months from the Release's September 26, 2023 Effective Date.  *See* Release, § 1(c)(i). However, the Restricted Period does not end on June 26, 2025, as it is "suspended" during Non-Compete violations.  *See* MIPA, § 6.08(b).  Hughes violated the Non-Compete at least as early as

---

[3] Prior to the Release, the MIPA was amended by a "First Amendment to the Membership Interest Purchase Agreement" and a "Second Amendment to the Membership Interest Purchase Agreement."  *See* Exs. 8-9.  These two amendments together with the MIPA and the Release are collectively referred to herein as the "Agreements."

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

July 2024 (eleven months prior to June 2025), *see* § III.B.3.b, and thereafter continuously did so, such that at least eleven months remain on the Non-Compete.

### D. **Defendants' Unlawful Conduct.**

Hughes launched his new company, The Négociant, on the back of his former company, Phoenix's, goodwill.  In so doing he breached the parties' Non-Compete and infringed the very trademarks he recently sold.

For example, Defendants use a website, "The Négociant Website," with a domain name: thenegociantwine.com ("The Négociant Domain Name").  At launch this website offered wine direct-to-consumers under the product name "The Négociant" and featured standard and stylized versions of that same mark.  *See* Atkinson Dec., ¶ 3.  The Négociant marks could be seen in text, in an image of a wine bottle emblazoned with the stylized mark, and in the domain name itself.  *See id.*; Exs. 10.1-10.3, 10.6 & 12-14.  Through their website, Defendants employed their marks to sell, offer to sell, distribute, and advertise their wine direct-to-consumers in direct competition with, and using the very same business model, as Plaintiffs.  *See* Exs. 10.1-10.7 & 12-14; §§ III.B.1.b (Factor 4) & III.B.3.b.  Defendants' marks will sow, and indeed are intended to sow, confusion amongst consumers vis-à-vis Plaintiff's DE NÉGOCE Marks.  *See* § III.B.1.b.  Martin Ray never permitted Defendants to use the Marks-in-Suit.  *See* Benham, Dec., ¶ 11.  Defendants' conduct violated 15 U.S.C. §§ 1114 and 1125(a) (trademark infringement and unfair competition).  In addition, Defendants' registration and continued use of the Négociant Domain Name violates 15 U.S.C. § 1125(d) (cybersquatting).  And, Defendants' conduct breaches the Non-Compete.  Defendants' cybersquatting and contract violations continue unabetted and the risk that they will continue to infringe the Marks-in-Suit is high.  Martin Ray brings this Motion to put an end to the Defendants' wrongful acts and stymie the harm being done while this case plays out to trial.

## III. **ARGUMENT.**

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4ᵀᴴ FLOOR
SAN FRANCISCO, CA 94105

## A.    The Standard for Granting a Preliminary Injunction.

A party seeking a preliminary injunction must show it is: (1) likely to succeed on the merits; (2) likely to suffer irreparable harm in the absence of relief; (3) that the equities on balance tip in its favor; and (4) that an injunction is in the public interest.  *See Biomax Health Products LLC v. Perfectx USA*, No. 23-cv-02834-SI, 2023 WL 4477210, at *2 (N.D. Cal. Jul. 11, 2023).  "In a trademark case, a plaintiff is entitled to a preliminary injunction if it can demonstrate either: (1) a combination of 'probable success on the merits' and 'the possibility of irreparable injury'; or (2) the existence of 'serious questions going to the merits' and that 'the balance of hardships tips sharply in [its] favor.'"  *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1049 (N.D. Cal. 2012); *see also Niantic, Inc. v. Global++*, No. 19-cv-03425-JST, 2019 WL 8333451, at * 5 (N.D. Cal. Sep. 26, 2019) (explaining that with a threshold showing on each factor: (1) serious merits questions; and (2) hardships tipping sharply towards plaintiff, can support an injunction).

## B.    Givin the Clear and Irrefutable Evidence Against Defendants, a Preliminary Injunction is Appropriate and Just in This Case.

Martin Ray is likely to prevail on the merits for each of the Lanham Act and breach of contract claims it asserts relevant to this Motion.

### 1.    Martin Ray is likely to succeed on its claims for Trademark Infringement under Sections 1114 and 1125(a) as to Both Marks-in-Suit.

"To establish a claim for trademark infringement [under Section 1114], Plaintiffs must prove that (1) they own valid trademarks, (2) Defendants used those marks without consent, [and] (3) [] Defendants' use of the marks is likely to cause confusion in the marketplace."  *Novus Optimum Labs v. Tamayo*, No. 13-cv-01119-JST, 2013 WL 3354566, at *4 (N.D. Cal. Jul 2, 2013).  Related unfair competition claims under Section 1125(a) may be proven via the same elements.  *See id*.

- 7 -

Notice of Mot. & Mot. for Preliminary    Case No. 4:25-cv-02925-JST
Injunction; Memo. ISO

Hosie Rice llp
149 New Montgomery Street, 4th Floor
San Francisco, CA 94105

As shown above, *see* § II.D, Defendants use the DE NÉGOCE Marks without consent. As shown below, Phoenix owns valid marks in the Marks-in-Suit and Defendants use of colorable imitations of these marks is likely to cause confusion.

> a. *Ownership and Validity of the Marks-in-Suit.*

The Standard DE NÉGOCE Mark consists of the standard characters "DE NÉGOCE" without claim to any particular font style, size, or color. The Stylized DE NÉGOCE Mark consists of the same characters in a stylized form:



As evidenced by their federal registration certificates (Exs. 1-2), the DE NÉGOCE Marks: were registered on the principal register on February 8, 2022; are registered for use with wine products; were used in commerce since June 8, 2020; and are owned by Phoenix. The DE NÉGOCE Marks are Plaintiff Phoenix's marks and they are valid. *See* 15 U.S.C. § 1115(a) ("Any registration ... of a mark registered on the principal register ... shall be prima facie evidence of the validity ... and of the registration ..., of the registrant's ownership ..., and of the registrant's exclusive right to use ....").

> b. *Likelihood of Confusion.*

The Ninth Circuit has identified eight factors, the *Sleekcraft* factors, for use in assessing likelihood of confusion: (1) the similarity of the marks; (2) the relatedness of the goods; (3) mark strength; (4) the infringer's intent; (5) the likely degree of consumer care; (6) the marketing channels used; (7) evidence of actual confusion; and (8) the likelihood of expansion into other markets. *See Stark*, 907 F. Supp. 2d at 1053. "Courts do not mechanically apply these factors and then tally the results; some factors are considered to be more important than others and each factor is not necessarily relevant in every case. Accordingly, this list functions as [a] guide and is 'neither exhaustive nor exclusive.'" *Id*. (citations omitted). Here, five of the factors, including the

similarity of the marks and the relatedness of the goods, strongly favor Plaintiffs, while the remaining three are, at worst for Martin Ray, neutral.  Here, a likelihood of confusion is high.  *See Rebecca Bamberger Works, LLC v. Bamberger*, No. 24-CV-706 JLS (DDL), 2024 WL 2805323 at *14 (S.D. Cal. May 31, 2024) ("Where two companies (1) directly compete in the same market and (2) their marks/offerings are virtually identical when encountered in that market, consumer confusion is likely to ensue even if all other *Sleekcraft* factors weigh against the plaintiff").  This high degree of likely confusion is not surprising, given Hughes deliberately chose Defendants' marks to trade on his former company's goodwill.  *See* Factor 4.

Factor 1: Mark Similarity

The DE NÉGOCE Marks are at least substantially similar to Defendants' "The Négociant" marks, which Defendants have used in both a standard and stylized form.  *See* Atkinson Dec., ¶ 3 (providing examples of Defendants' uses).  This factor weighs heavily in Martin Ray's favor.

"Similarity of the marks is tested on three levels: sight, sound, and meaning." *BNSF Ry. Co. v. Float Alaska IP*, LLC, No. 2:23-cv-03934-MCS-JC, 2023 WL 6783506 at *6 (C.D. Cal. Aug. 28, 2023).  "[S]imilarities are weighed more heavily than differences." *Stark*, 907 F. Supp. 2d at 1053. "In comparing the parties' marks, the court must focus on how each of the marks are perceived by the ordinary consumer in the marketplace ...." *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, No. C 05–0587 MHP, 2005 WL 701599, at * 5 (N.D. Cal. Mar. 23. 2005).  It is the average American wine purchaser's perception that is relevant here.  *See id*.

Both Plaintiffs' and Defendants' marks comprise two phrases: "de" v. "the" and "Négoce" v. "Négociant;" with both sets of marks containing the sequential letters "negoc;" and, in many cases, with both having the same accented "é;" and in some cases, with Defendants' mark consisting of essentially identical font and the same capitalized, tilting "N," as Plaintiffs' stylized

1    mark, with Defendants' stylized mark appearing on a label that is similar in color to Plaintiffs' label

2    and located in a similar position.  As can been seen, the marks are strikingly similar in appearance:

| Defendants' label from The Négociant Website (Defendants removed this image from the website after this action was initiated).  *See* Exs. 10.6 & 13 at 6-8. |  | A Plaintiffs' label from its website: denegoce.com.  *See* Ex. 15. |  |
|---|---|---|---|

14    Both marks, French phrases, are pronounced similarly and so are similar in sound.

15    With these French phrases appearing on wine bottles on Internet storefronts, in domain

16    names, and on websites, and with these phrases not being a common part of the American

17    vernacular, the average consumer is unlikely to attribute meaning to them, and so the meaning

18    prong is not relevant here.  *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee*

19    *En 1772*, 396 F.3d 1369, 1377 (Fed. Cir. 2005) ("Although words from modern languages are

20    generally translated into English, the doctrine of foreign equivalents is not an absolute rule and

21    should be viewed merely as a guideline.  The doctrine should be applied only when it is likely that

22    the ordinary American purchaser would 'stop and translate [the word] into its English equivalent'")

23    (citations omitted); *compare id.* (agreeing "that it is improbable that the average American

24    purchaser would stop and translate 'VEUVE' into 'widow'" in the context of sparkling wines) *with*

25    *Sutter*, 2005 WL 701599, at * 7 (translating "Ménage a Trois" and "Mélange de Trois" in the

26    context of wines where the first term "could just as aptly be characterized as part of the lexicon of

American English" and the second term's words "are almost as widely understood"). If meaning is relevant, both sets of marks have a similar meaning with "de négoce" meaning "of the trade" and "the négociant" meaning "the trader." *See* Exs. 1-2 (Marks-in-Suit registrations); 16-17 (Google translations); 19 (non-party mark registration); *cf.* Ex. 18 (Google translation).

The high degree of likely confusion caused by the marks' conspicuous similarities is further amplified, given the Marks-in-Suit are *Hughes' former* marks and the infringing marks are *Hughes' current marks*:

> The fact that Cook used to sell American "California Gold" brand alfalfa seed in the past adds to the likelihood of confusion notwithstanding the fact that the buyers are assumed to be sophisticated parties. *See Church of Scientology International v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 44 (2nd Cir.1986) ("A licensee or franchisee who once possessed authorization to use the trademarks of its licensor or franchisor becomes associated in the public's mind with the trademark holder. When such party, as defendants here, loses its authorization yet continues to use the mark, the potential for consumer confusion is greater than in the case of a random infringer. Consumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public").

*Seed Services, Inc. v. Winsor Grain, Inc*., 868 F.Supp.2d 998, 1004 (E.D. Cal. 2012).

Factor 2: The Relatedness of the Goods

The marks are used on the same products, wine (and more, both labels are non-vineyard owning labels). This factor weighs heavily in Martin Ray's favor. *See Stark*, 907 F. Supp. 2d at 1057 ("'[W]ines of all types constitute a single class of goods.' All of the goods at issue are wine; that is enough to satisfy the relatedness element") (citations omitted).

Factor 3: Mark Strength

Mark strength "is evaluated both in terms of [] conceptual strength and [] commercial strength." *Stark*, 907 F. Supp. 2d at 1058. "Marks can be conceptually classified along a spectrum of increasing inherent distinctiveness ...: generic → descriptive → suggestive → arbitrary → fanciful." 'Marks that are suggestive, arbitrary or fanciful ... 'are deemed inherently distinctive.'"

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

*Id*. at 1059.  Generic marks are not entitled to protection and descriptive marks are protected where they have acquired distinctiveness (secondary meaning) through use.  *See Zobmondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).  As to commercial strength, product sales are considered.  *See Stark*, 907 F. Supp. 2d at 1061 (considering sales).  "Advertising, length of time in business, and public recognition are [also] factors taken into account when classifying the commercial strength of marks."  *Id*.

The Marks-in-Suit are conceptually strong.  As is in this case, *see* Exs. 20-21 (mark file wrappers), "[w]here the PTO issues a registration without requiring proof of secondary meaning, the presumption is that the mark is inherently distinctive."  *Zobmondo*, 602 F.3d at 1114-15.  This presumption is sound.  Here, at worst, the marks are suggestive.  The imagination test is the most used test for distinguishing between suggestive and descriptive marks.  It "asks whether 'imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced.'"  *Zobmondo*, 602 F.3d at 1115.  "Of the trade" as applied to wine requires at least a leap.  It certainly takes imagination to go from "of, relating to, or used in trade," "intended for or limited to persons in a business or industry," or "serving others in the same business rather than the ultimate user or consumer," to a bottle of wine sold to end consumers.  *See* Ex. 22 (Merriam Webster definitions for "trade," adjective) (a dictionary search for "of the trade" produced no results.  *See* Ex. 23).

But the marks here are in fact fanciful, given, as explained above, *see* Factor 1, consumers would not translate "de négoce."  And, even translated the marks are in fact very strong, as they would be arbitrary, not suggestive.  "Of the trade" does not connote wine or a business model where excess wine is bought and then resold under the buyer's label for a lower price to the public.  *See Stark*, 907 F. Supp. 2d at 1059 ("Arbitrary marks are words ... when used in combination with the goods ... at issue, have no descriptive connotation with those goods ....").  If "of the trade" were

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

suggestive or descriptive, it would be suggestive or descriptive of virtually every product, as virtually every product is of the trade, in the sense it is made, sold, relates to trade, or has a business insider component.  But if a word is suggestive or descriptive of every good then it must be arbitrary as applied to any specific class of goods, as it connotes no one set of goods.

The Marks-in-Suit are very (or at least moderately) conceptually strong.  *See Stark*, 907 F. Supp. 2d at 1059 ("A 'strong trademark' is one used only in a ... arbitrary, and fanciful manner'"); *id*. at 1061 ("the Court finds that the mark 'Stark Thirst™' is suggestive and therefore moderately strong").  Their strength is further heightened by their commercial success.  The Marks-in-Suit have been used continuously to promote de Négoce wine for five years; Phoenix's sales for that same period (inception to year to date) were approximately $63.5 million; volume of bottles moved by Phoenix from 2021 to present was over 3 million; de Négoce is promoted through its website, social media advertisement placements, and Google and MSN search placements; de Négoce wine has been shipped widely throughout the U.S.; and de Négoce was featured by prominent publications, including Robb Report, Forbes, and the San Francico Chronicle.  *See* Brenham Dec., ¶¶ 6-10; Exs. 24-26.  More, MRW acquired de Négoce from Hughes for $12.5 million, *see* Benham Dec., ¶ 4, and Defendants deliberately copied the Marks-in-Suit.  *See* Factor 4 below.

The strength of mark factor strongly favors Martin Ray.

Factor 4: The Infringer's Intent

The intent factor "favors the plaintiff 'where the alleged infringer adopted his mark with knowledge ... that it was another's trademark.'  "When 'an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public.'"  *JL Beverage Co., LLC v. Jim Beam Brands Co*., 828 F.3d 1098, 1111-12 (9th Cir. 2016) (citations omitted); *see also Bamberger*, 2024 WL 2805323 at *14 ("This factor is somewhat misnamed—it focuses '... on ... knowledge ....'").  Defendants knew of the Marks-in-Suit prior to adopting their marks.

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

- 13 -

The Marks-in-Suit belong to Phoenix and Phoenix belonged to Hughes. *See* MIPA, Recital A; Ex. 11 (excerpted MIPA disclosure statement). Hughes signed the federal applications for the Marks-in-Suit as Phoenix's "Managing Partner/Owner." Exs. 20 at 007 & 21 at 007. The Marks-in-Suit obtained their registrations prior to Hughes selling Phoenix. *Compare* Exs. 1-2 (February 2022 registrations) *with* MIPA, Preamble (January 2023 effective date). Yet Hughes, in violation of a Non-Compete he entered into as part of the transaction in which he sold Phoenix, the Marks-in-Suit, and their goodwill, *see* § III.B.3, prepared to and in fact launched a business that uses the same business model as Phoenix and marks that rip-off Phoenix's marks. *Compare* Exs. 10.6 & 13 at 7 ("Our team collaborates with ... renowned winemakers .... Because we source from an extensive array of wineries, ***The Négociant*** does not adhere to a 'house style' .... all offered without the prohibitive price .... Each 'Lot' ....") *with* Ex. 27 ("[W]e discreetly buy from top shelf wineries ... and offer them directly to you under our label [(de Négoce)] at a tiny fraction of the original price .... Each wine we acquire is assigned a unique 'Lot'....") (emphasis in original). Hughes went so far as to register a domain name: **thenegociant**wine.com, that is similar to Phoenix's: **denegoce**.com website, and which knocks-offs the DE NÉGOCE Marks. *See also* § III.B.2. Not only is it irrefutable that the Defendants knew of the Marks-in-Suit when they adopted their marks, it is clear this adoption was done with the willful intent to trade on Hughes' former marks' goodwill, by, for example, driving consumers looking for de Négoce wine to The Négociant Website. This factor heavily favors Martin Ray.

Factor 5: The Likely Degree of Consumer Care

"The next factor to be considered is the degree of care that a consumer is likely to exercise in purchasing the parties' products. The court views the parties' products from the standpoint of 'typical buyer exercising ordinary caution' .... "'[C]onfusion between marks is generally more likely where the goods at issue involve relatively inexpensive, 'impulse' products to which the

average, 'unsophisticated' consumer does not devote a great deal of care and consideration in purchasing.'" *Sutter*, 2005 WL 701599, at *11 (citations omitted).

de Négoce ready to drink wines are typically sold for $20-40 a bottle. de Négoce "futures"—wines that should be aged a bit before drinking—are sold for under $300 for 12 bottles and at about $160 for 6 bottles. *See* Benham Dec., ¶ 10. Defendants intend to sell their wines at similarly low-price points, as low-cost, yet high-quality wine is exactly the point of the business model being employed. *See, e.g.*, Exs. 12 ("$100+ quality Oakville, Rutherford ... for prices too low to print"); 10.2 & 13 at 2 ("The Négociant by Cameron Hughes will soon be taking reservations. These highly-anticipated, incredibly-priced, exceptional wines are guaranteed to sell-out fast"); *cf.* Exs. 28.1-.5 (selling "Cameron Hughes, Négociant" futures wine under a non-accused (but still Non-Compete violating) label at between $99 and $249 for 12 bottles). The products here are relatively inexpensive; this factor favors Plaintiffs. *See Sutter*, 2005 WL 701599, at *11 (noting that the wines there were "moderate-to-modestly high" in price and that many of defendant's purchasers, small winery visitors or wine club members, may be more discerning, but still finding this factor to weigh in plaintiff's favor); *Stark*, 907 F. Supp. 2d at 1065 ("Wine is considered a good with which the average consumer does not exercise care when purchasing").

Factors 6, 7 & 8: Marketing Channels, Evidence of Actual Confusion & Likelihood of Expansion

"In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *BNSF*, 2023 WL 6783506 at *7. The parties use the same channels, as they employ their websites to make the same pitch to the same consumers. *See* Factors 4 & 5 above. However, courts have trended towards giving online channels little consideration, and so, without conceding that should be the case here, at worst for Plaintiffs this factor is neutral. *See id.*, at *7 ("'[T]he fact that both parties sell products online adds little weight ....' [Citation] .... this factor is neutral"); *City & County of San Francisco v. City of*

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

*Oakland*, No. 24-cv-02311-TSH, 2024 WL 4775737, at *9 (N.D. Cal. Nov. 12, 2024) ("'[I]t would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light'.... [T]his factor favors neither party ....'").

Plaintiffs do not present actual confusion evidence at this time.  The lack of such evidence "at this early stage favors neither [Martin Ray] nor [Defendants].  This factor is neutral."  *BNSF*, 2023 WL 6783506 at *7 (citation omitted); *see also Stark*, 907 F. Supp. 2d at 1064 (neutral where no evidence); *but see Sutter*, 2005 WL 701599, at *12 (lack of evidence favored defendant).

"Because the parties ... already sell directly competing products, [the likelihood of expansion] factor is inapposite ...."  *Sutter*, 2005 WL 701599, at *13; *cf. BNSF*, 2023 WL 6783506 at *13 n.10 (declining to address this factor given party competition).

On balance, Defendants' copycat marks are highly likely to cause consumer confusion.  Defendants infringe the DE NÉGOCE Marks.

### 2.    Martin Ray is likely to succeed on its claim for Cybersquatting under Section 1125(d)—Standard DE NÉGOCE Mark.

Defendants' The Négociant Domain Name cybersquats on Martin Ray's Standard DE NÉGOCE Mark.  Cybersquatting occurs when:

> "[A] person ... registers the domain name of a well known trademark and then attempts to profit ... by using the domain name to divert business from the trademark holder to the domain name holder."  [¶] To prove a violation ... a plaintiff must show that (1) the plaintiff owns a valid trademark that was distinctive ... at the time the domain name was registered, (2) defendants registered ... or used a domain name that is ... confusingly similar to the plaintiff's mark, and (3) defendants had a bad faith intent to profit from the plaintiff's mark.

*Novus*, 2013 WL 3354566, at *5 (citations omitted).  As to the second requirement:

> [T]he confusingly similar analysis is "narrower than the traditional multifactor ... test" .... [with] "[t]he only relevant question [being] 'whether the domain names ... are identical or confusingly similar to a plaintiff's mark."  Domain names may be confusingly similar ... if they incorporate the mark or if they add, delete, or rearrange letters ....[or] if they simply add "generic terms...[or] a top level domain suffix ...."

Hosie Rice LLP
149 New Montgomery Street, 4ᵗʰ Floor
San Francisco, CA 94105

*Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1097 (N.D. Cal. 2014), adopting Report.  As to the third requirement, the statute sets out a "permissive and not exhaustive" factor list.  *Digby Adler Group LLC v. Image Rent a Car, Inc.*, 79 F. Supp. 3d 1095, 1102 (N.D. Cal. 2015).  "[T]he Ninth Circuit has emphasized that courts 'need not, however, march through the nine factors seriatim.... [I]nstead, the most important grounds for finding bad faith are the unique circumstances of the case." *Id*.

Martin Ray's standard mark is valid and distinctive, *see* §§ III.B.1.a & III.B.1.b (Factor 3), and it was distinctive at the time Defendants registered their domain name.  *See* Exs. 10.3 & 13 at 4 (The Négociant Website identifying The Négociant as Hughes' venture); *compare* Exs. 1-2 (2022 mark registrations) *with* Ex. 29 (2024 domain registration).  And, the Standard DE NÉGOCE Mark and The Négociant Domain Name are, even "without regard to the goods," *see* 15 U.S.C. § 1125(d), confusingly similar, as demonstrated above.  *See* § III.B.1.b (Factor 1).  Indeed, much of the mark is subsumed within the domain name, *compare* "de **négoce**" *with* the**negoci**antewine.com, with that language merely surrounded by generic terms.  *See Novus*, 2013 WL 3354566, at *5 (domain "**novusopti**lab.webs.com" confusingly similar with mark "**Novus Optimum**").

Defendants' registration and use of its domain name was done with the bad faith intent to profit from Plaintiffs' standard mark.  For example, Defendants chose their domain name with knowledge of the standard mark and the specific intent to divert Plaintiffs' customers to their site despite being bound by a Non-Compete to not even be in the same business as Plaintiffs in the first place.  *See* § III.B.1.b (Factor 4), 15 U.S.C. § 1125(d)(1)(B)(i)(V).  Further, the mark, a fanciful or arbitrary mark, is highly distinctive, and Defendants have made no attempt to register The Négociant with the P.T.O.  *See* § III.B.1.b (Factors 3); Atkinson Dec., ¶ 4; 15 U.S.C. § 1125(d)(1)(B)(i)(I) & (V).  More, Defendants used their imitation marks on the website hosted by the infringing domain name on the very products (wine) Plaintiffs sell under the marks in an unfair and commercial manner, and, to date, despite the initiation of this action, Defendants continue to

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

use the domain name.  *See* §§ III.B.3.b & III.B.1.b (Factor 1); Atkinson Dec., ¶ 5; 5 U.S.C. §

1125(d)(1)(B)(i)(IV); *Intel Corp. v. Am. News Intel Pub., LLC*, No. C 09–05085 CRB, 2010 WL

2740063 at *6 (N.D. Cal. Jul. 12, 2010) ("[T]he allegation that ANIP's websites prominently

feature Intel's trademarks and products, combined with the fact that ANIP's domain names use and

emphasize the term "intel," is sufficient to state a plausible claim that ANIP registered ... with the

bad faith intent ...."); 4 McCarthy on Trademarks & Unfair Competition, § 25A:51 (5th ed. 2025)

("But to determine if the 'bad faith'... exists, the respective goods ... of the parties will be

considered").

### 3.    Martin Ray is likely to succeed on its claim for Breach of the Non-Compete.

"To prevail on a breach of contract claim in California, a plaintiff must show '(1) the

existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's

breach, and (4) the resulting damages to the plaintiff." *Bamberger*, 2024 WL 2805323 at *15.

As explained in the Irreparable Harm Section, *see* § III.C, Plaintiffs have been damaged.  As

detailed in this Section, the Non-Compete is valid and enforceable and Hughes' many activities

related to his The Négociant business violate the Non-Compete.  Finally, Plaintiffs have

performed—for example MRW paid Hughes $12.5 million, *see* Benham Dec., ¶ 4—and/or any

non-performance was excused—for example, Hughes breached the Non-Compete.

#### a.    *The Non-Compete is Reasonable and So Valid and Enforceable*.

The Non-Compete is valid and enforceable pursuant to California Business & Professional

Code Section 16601, as Hughes entered into it in conjunction with the sale of Phoenix.  *See*

*Bamberger*, 2024 WL 2805323 at *17 (explaining that Section 16601 "'prevent[s] the seller from

depriving the buyer of the full value of its acquisition'").  The Non-Compete is reasonable, as

Hughes acknowledged: "Seller hereby acknowledges and agrees that this Section 6.08 is reasonable

and valid in geographic and temporal scope and in all other respects."  MIPA, § 6.08(a).

- 18 -

Hosie Rice LLP
149 New Montgomery Street, 4th Floor
San Francisco, CA 94105

The Non-Compete is reasonable in duration, as its length is a mere 21 months.  *See* § II.C.

The Non-Compete is reasonable in geographic scope.  Hughes' conduct is proscribed in the "Target Area."  *See* MIPA, § 6.08(a).  The "'Target Area' means the geographic area consisting of the areas in which the Company actively conducts business in, including but not limited to the [U.S.], Europe, and Australia."  *See id.*, Defined Terms at p. 8.  The restriction is limited to where "the Company actively conducts business."  Phoenix pre- and post-MRW acquisition has sold wine widely throughout the U.S.  *See* Benham Dec., ¶ 7; Exs. 30 (Phoenix Am. Operating Agreement Excerpt), § 2.3 ("the specific purpose of the Company is to manage and operate a wine sales and marketing business ...."); 31 (2022 Accountants Report Note: "Phoenix Wine Company, LLC dba De Negoce Wines .... The Company purchases bulk wines primarily from California, Washington and Oregon vineyards.  The wine is then bottled and sold directly to consumers online ...."); 3-4 & 15 (de Négoce website page excerpts).  This restriction, which is limited by business activities to the U.S., comports with the statute.  *See* Cal. Bus. & Prof. Code § 16601 ("within a specified geographic area in which the business so sold, or that of the business entity ... has been carried on, so long as the buyer ... carries on a like business therein"); *cf. Bamberger*, 2024 WL 2805323 at *17-18 (holding that plaintiffs, on a preliminary injunction motion, were likely to succeed on their non-compete claim, because the Court would likely "reform" / "blue pencil" the restriction "to be limited to the geographic scope of [sold company's] business").

The Non-Compete is reasonable in its business reach.  Hughes "shall not, directly or indirectly (i) own, engage in ... the ... management, operation ... of, any entity ... or individual that engages in any activity ... that is competitive to any reasonable extent with the Wine Business, or (ii) be a stockholder, agent ... to any entity ... or individual that engages in any activity ... that is competitive to any reasonable extent with the Wine Business."  MIPA, § 6.08(a).  "Wine Business" means: "any company whose business or proposed business in any way involves or relates to

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

creating, developing, designing, distributing, producing, advertising, promoting, marketing or selling wine products or wine brands in a manner that is similar to, or directly competes, with Company ...."). *Id*., Defined Terms at p. 9. The "Company" is Phoenix. *Id*., Preamble. This limitation, which is cabined by Phoenix's activities, comports with the statute. *See* Cal. Bus. & Prof. Code § 16601 ("refrain from carrying on a similar business"). More, the "Wine Business" is subject to specific carveouts, which further cabin its reach. *See* MIPA, § 6.08(a) ("The following activities ... shall not be deemed a breach ....") & Release, § 1(c)(ii) ("It is agreed ... it shall not be a breach ...").

### b. Hughes Breached the Non-Compete.

Hughes' preparations to launch, launch of, and continued activities related to his The Négociant business violate the Non-Compete.

Hughes' Non-Compete violations began at least as early as July 2024, when he applied to register a mark for "[a]lcoholic beverages except beers." *Compare* Ex. 32 ("CAM X" mark application) at 006 *with* Ex. 42 (identifying mark applicant's service agent as Hughes) *with* below (discussing Defendants' competitive CAM X brand). Hughes' wrongful activity then continued with him registering the "thenegociantwine.com" domain and amending website terms of service in December 2024, and him promoting his new business by informing the Wall Street Journal and San Francisco Chronicle of its pending launch. *See* Exs. 29; 33; 5 at 2; 34 at 6. This preparatory work violated the Non-Compete. *See* MIPA, § 6.08(a) ("shall not ... establish ....") & Defined Terms, "Wine Business" at p. 9 ("proposed business ... creating, developing ....").

Hughes went live with his The Négociant Website in March 2024, posting to a thread on a prominent online wine aficionado forum, WineBerserkers, that the Wall Street Journal article "pushed [him] out the gate a little early." *See* Ex. 35. At launch The Négociant Website contained statements that made clear that it was a direct-to-consumer, non-vineyard owning wine business that

relied on the same business model as Phoenix.  For example, The Négociant Website targets the end wine consumer.  It featured a sign-up, pop-up for "marketing text messages (e.g., promotions, cart reminders) from The Négociant" that said that: "An incredible lineup is on the way!... for prices too low to print .... Our wines sell uber-quick, so reserve access now."  Ex. 12.  And, under a "How It Works" section, the main page said: "members will be presented ... with opportunities to 'reserve' upcoming wine releases (AKA 'Lots') with a simple, refundable deposit.  Once the wine is in the bottle, you'll be charged for the remainder due ...."  Exs. 10.4 & 13 at 4.  The site, alongside a wine bottle emblazoned with a trademark infringing logo, also explained the use of the non-vineyard owning label model: "Our team collaborates with top-tier growers .... Because we source from an extensive array of wineries .... incredible wines, all offered without the prohibitive price tags ...."  Exs. 10.6 & 13 at 7.  And the site sold "Founding Memberships" for "$1000," which "Sold Out," where the $1,000 was a credit for The Négociant wine, i.e., the site sold wine, wine sold under the trademark infringing product name, "The Négociant," *see* § III.B.1.b (Factor 1):



*See* Exs. 14 & 41.  Today, post-Complaint filing, the main page continues to explain the business model: "Because we source from an extensive array of wineries ... incredible wines, all offered without prohibitive price tags ....;" however, it now features images of wines with a different, non-

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

accused as to trademark infringement logo, a "Cam X" logo.  Exs. 36.1-.2 & 37.  The site also now features a "Products" page that lists "Cam X" wine "lots," each labeled "Sold out."  Ex. 38.

The Négociant, with its direct-to-consumer wine memberships and product listings, is a direct Phoenix competitor.  Its existence and operations are a blatant violation of the Non-Compete. *See* MIPA, § 6.08(a) ("shall not ... engages in any activity ... that is competitive to any reasonable extent ....") & Defined Terms, "Wine Business" at p. 9 ("business ... in any way involves or relates to ... distributing, producing, ... selling wine products or wine brands in a manner that is similar to, or directly competes, with [Phoenix]").

Post-Complaint filing Hughes set-up a direct-to-consumer wine shop on a third-party platform called WineVIP.  This is not some industry buyer now reselling Hughes' wine to the public.  This is a Hughes controlled shop hosted on a third-party site as evidenced from, with the exception of Hughes' storefront, WineVIP's dedication to foreign wines.  *Compare* Exs. 28.1-.5 ("Cameron Hughes, Négociant" page on WineVIP displaying "Cam X **Californian** wine "futures" for sale) *with* Ex. 39 (WineVIP wine page with WineVIP logo tag line at top right: "We specialize in Imported Wines," and with the "Country" tab expanded at mid-left showing "0" for "USA").  Hughes cannot side-step the Non-Compete by selling wine direct-to-consumers through a third-party platform.  *See* MIPA, § 6.08(a) ("shall not, directly or indirectly ... control ...").

Hughes' activities do not fall within any of the Non-Compete's carveouts.  Hughes is not a "passive minority owner."  *See* MIPA, § 6.08(a) (carveout "b").  This is his company and his wines and he promotes them.  *See, e.g.*, Exs. 13 at 4 ("Welcome To The Négociant[:] Cameron Hughes here, inviting you to join me .... my latest venture, The Négociant by Cameron Hughes"); 5 at 2 ("Hughes ... is now launching the Négociant Wine Company"); 40 (WineVIP link posted by a Wine Berserkers user who responds to another user's question: "How did you find/track down that link John?," with: "The email that we got from Cam had a link in it").  The Négociant does not "own[]

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

vineyards" that it "sell[s] grapes or bulk wine from" nor is it "an events facility" "for weddings" "that includes a tasting room."  *Compare* § 6.08(a) (carveouts "a" & "c") *with e.g.*, Exs. 10.1-.7; 12-14; 36.1-.2; 37-38 (The Négociant Website pages).  And, The Négociant targets end consumers not "wholesalers, distributors, or [] wine retailers."  *Compare* Release, § 1(c)(ii) (the "Wholesaler Carveout") *with e.g.*, Exs. 10.1-.7; 12-14; 36.1-.2; 37-38 (The Négociant Website pages).  More, the Wholesaler Carveout is no more.  Hughes' direct-to-consumer sales, for example, through his "Founding Memberships," negated it: "it shall not be a breach ... to market and sell wine to wholesalers ... ***provided*** Hughes at no times sells wine direct to consumers."  And, even if Hughes could and was marketing and selling under the Wholesaler Carveout to wine retailers and not selling direct to consumers, his promotional activities targeting end consumers would still constitute a breach.  *See* MIPA, Defined Terms, "Wine Business" at p. 9 ("any company whose business ... in any way involves or relates to ... advertising, promoting, marketing ...").

Hughes' Non-Compete violations are extensive, continuous, and brazen.  Hughes breached the parties' Agreements and continues to do so.

### C.    <u>Martin Ray Will Suffer Irreparable Harm Absent a Preliminary Injunction</u>.

The Defendants' Non-Compete violations are ongoing, as is their cybersquatting.  *See* §§ III.B.3.b & III.B.2.  While the filing of the Originial Complaint in this action caused Defendants, for now, to retreat from use of their infringing, The Négociant, product marks, the risk of harm from use of these marks remains high, especially given Defendants' continued use of the The Négociant Website.  *See Niantic*, 2019 WL 8333451, at * 8 ("'An inference arises from illegal past conduct that future violations may occur,' and 'the fact that illegal conduct has ceased does not foreclose injunctive relief' .... Moreover, 'courts must be particularly skeptical about attaching any significance to contrition under protest'") (citations omitted); *see also Novus*, 2013 WL 3354566, at *7.  The risk of harm to Plaintiffs is substantial, and that harm is irreparable.

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

- 23 -

Martin Ray has suffered detriment to its hard-won reputation and goodwill, the loss of control of its trademarks, lost trade, and the lost benefit of a non-compete.  This is exactly the sort of harm that is irreparable.  *See Seed Services*, 868 F.Supp.2d at 1005 ("'In trademark cases, courts have found irreparable harm in the loss of control of a business' reputation, a loss of trade and loss of goodwill'"); *Ocean Beauty Seafoods, LLC v. Pacific Seafood Gr'p*., 648 Fed. App'x 709, 711 (9th Cir. 2016) ("An enforceable noncompete agreement affords fair protection to a legitimate interest of the former employer.  Thus, a breach of the agreement occasions harm.  Because the harm is intangible and difficult to quantify, it qualifies as irreparable").  More, Martin Ray, having shown a likelihood of success on its Lanham Act claims, is afforded a presumption of irreparable harm.  *See Biomax*, 2023 WL 4477210, at *3.

**D.    The Balance of Hardships/Equities Tips Sharply in Martin Ray's Favor.**

"When assessing [the equities] factor, the Court 'must 'balance the interests of all parties and weigh the damage to each.''"  *Bamberger*, 2024 WL 2805323, at *19.  Martin Ray has suffered irreparable, ongoing harm and its chances on the merits are high.  In contrast, Defendants—who knowingly incurred the risk of violating Hughes' contractual commitments and copying Martin Ray's marks—will be enjoined from doing what they highly likely are not permitted to do in the first place.  The equities sharply favor Martin Ray.  *See Bamberger*, 2024 WL 2805323 at *19 ("Any hardship Defendants suffer from being required to comply with their statutory and contractual duties cannot weigh in their favor .... Even assuming this injunction forces BIG to cease[] its operations, Bamberger and RBW will be placed in the position they contemplated when they signed the RCA"); *Biomax*, 2023 WL 4477210, at *3 ("'Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be [trademark] infringing, such an argument in defense merits little equitable consideration'"); *Seed Services*, 868 F.Supp.2d at 1005 ("The equities fall firmly in [plaintiff]'s favor .... Defendants purposefully chose

- 24 -

the Australian trademark to copy the American trademark"); *BNSF*, 2023 WL 6783506 at *10

("[T]he Court agrees with [plaintiff], as [defendant] can more easily pivot due to its relatively

young age as a company").

### E.    The Public Interest Favors a Preliminary Injunction.

The public interest is served by granting the requested injunction, as this relief will uphold

the Lanham Act and the parties' Agreements. *See Biomax*, 2023 WL 4477210, at *3 ("'In addition

to the harm caused the trademark owner, the consuming public is equally injured by an inadequate

judicial response to trademark infringement'"); *Seed Services*, 868 F.Supp.2d at 1005-06 ("'[T]he

public has an interest in requiring parties to honor their contractual obligations.' [Citation.]

Defendants sold the 'California Gold' trademark to [Plaintiff]. Protecting the enjoyment of that

trademark is a valid public interest").

### F.    No Bond Should be Required.

Martin Ray submits that it should not be required to post a bond in this case or any bond

should be nominal. Under Fed. R. Civ. P. 65(c), the court retains discretion as to the bond amount

and it may dispense with requiring one altogether. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th

Cir. 2011). In dispensing with a bond, the court may consider whether "there is no realistic

likelihood of harm to the defendant from enjoining" its conduct. *Niantic*, 2019 WL 8333451, at *9.

There is no realistic harm here where the injunction "would 'simply enjoin Defendants from doing

something Defendants never had a right to do in the first place.'" *Id*. (requiring no bond).

Date:   June 13, 2025                         Respectfully submitted,

                                              */s/ Darrell R. Atkinson*
                                              SPENCER HOSIE
                                              shosie@hosielaw.com
                                              DIANE S. RICE
                                              drice@hosielaw.com
                                              DARRELL R. ATKINSON
                                              datkinson@hosielaw.com
                                              HOSIE RICE LLP

HOSIE RICE LLP
149 NEW MONTGOMERY STREET, 4TH FLOOR
SAN FRANCISCO, CA 94105

149 New Montgomery Street, 4th Floor
San Francisco, CA 94105

Attorneys for Plaintiff MARTIN RAY
WINERY, INC and PHOENIX WINE
COMPANY, LLC