UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN RAY WINERY, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CAMERON HUGHES, et al.,<br><br>Defendants. | Case No. 25-cv-02925-JST<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 40 |

Before the Court is Defendants Cameron Hughes and The Négociant's (together, "Defendants") motion to dismiss for forum non conveniens. ECF No. 40. The Court will grant the motion.

## I.   BACKGROUND

### A.   The Claims

Plaintiffs Martin Ray Winery, Inc. ("MRW") and Phoenix Wine Company, LLC ("Phoenix") bring this action against Defendants alleging trademark infringement, breach of contract, unfair competition, and related misconduct following Hughes's sale of Phoenix to MRW. For purposes of this motion, the Court takes as true the following facts from the allegations in the operative complaint.

Phoenix was previously owned and operated by Hughes. ECF No. 21 ¶ 47 ("FAC"). Phoenix sold wine under the "de Négoce" label, using a direct-to-consumer model that offered reduced prices on its wines compared to other wines of similar quality sold through retail channels. ECF No. 21 ¶ 47 ("FAC").

In 2023, MRW acquired Phoenix including its de Négoce trademarks, intellectual property, and goodwill, for a total of $12.5 million across two transactions. *Id.* ¶ 48. The first transaction

took place in January 2023, in which MRW acquired a 51% controlling interest in de Négoce (Phoenix), and was memorialized in a "Membership Interest Purchase Agreement." *Id.*; *see also* ECF No. 21-3 ("MIPA"). The second transaction took place in September 2023, in which MRW acquired the remaining 49% of de Négoce (Phoenix), and was memorialized in the "Agreement and Release in Full of All Claims and Rights" or "Release." ECF No. 21 ¶ 48; *see also* ECF No. 21-4 (the "Release"). Prior to the Release, the MIPA was amended twice. ECF No. 21 ¶ 48 n.4.

The MIPA contained a non-compete agreement, which prohibited Hughes from engaging, directly or indirectly, in any wine business that was competitive with de Négoce in areas where Phoenix operated, including the United States. ECF No. 21 ¶¶ 49–52. The Non-Compete's "Restricted Period" was originally set forth in the MIPA's "Defined Terms," but the Release amended the defined "Restricted Period" to provide for a period of 21 months beginning from September 26, 2023. *Id.* ¶ 50. The Release also added a "self-revoking carveout" allowing Hughes to sell wine only to wholesalers, distributors, or retailers, but explicitly prohibiting direct-to-consumer sales. *Id.* ¶ 53. And the Release also contains a non-disparagement clause whereby both MRW and Hughes agreed to refrain from all statements and conduct that might tend to disparage or damage the reputation, goodwill or good standing in the community of the other. *Id.* ¶ 56 (quoting Release § 15).

Despite these restrictions, Hughes began preparing to reenter the direct-to-consumer wine market as early as mid-2024—well within the restricted period—by launching a new business under the name "The Négociant." *Id.* ¶ 58. Plaintiffs contend that Hughes adopted a nearly identical business model to Phoenix: sourcing excess wine from wineries, bottling it under a new private label, and selling it online directly to consumers. *Id.* ¶¶ 63, 72–73. Plaintiffs claim that Hughes also engaged in deliberate brand mimicry—using product names, visual labels, domain names (thenegociantwine.com), and stylized fonts that intentionally evoke and resemble the "de Négoce" trademarks, both standard and stylized. *Id.* ¶¶ 75–79.

Plaintiffs assert fourteen claims, including claims for (1) federal trademark infringement of both the standard and stylized de Négoce Mark; (2) federal trademark counterfeiting of the stylized de Négoce Mark; (3) unfair competition under the Lanham Act, 15 U.S.C. 1125(a), for

2

use of a mark similar to the standard and stylized de Négoce Mark; (4) cybersquatting under 15 U.S.C. § 1125(d) as to both the standard and stylized mark; (5) unfair competition under Cal. Bus. & Prof. Code § 17200; (6) false advertising under Cal. Bus. & Prof. Code § 17500; (7) trademark infringement under California common law of both the standard and stylized mark; (8) unfair competition under California common law; (9) breach of contract; and (10) intentional interference with contractual relations.

### B. The Venue Clauses

Relevant to the current dispute, the agreements that the parties entered into governing the sale of Phoenix and its related intellectual property contained various venue provisions.

Section 10.10 of the MIPA provides: "If any dispute arises under this Agreement, the parties shall first use their best efforts to reach agreement on the matters in dispute under the terms herein. If such efforts do not resolve the dispute, either Party may commence litigation in Superior Court, County of Sonoma."[1]

Paragraph 7 of the Release, entitled "Governing Law," provides: "This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of California. If any civil action is filed to enforce or interpret any of the terms or provisions of this Agreement, or otherwise, the Parties agree that the appropriate venue shall be a state court of competent jurisdiction located in the County of Sonoma, State of California."

## II. LEGAL STANDARD

"A district court has discretion to decline to exercise jurisdiction in a case where litigation in a foreign forum would be more convenient for the parties." *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001) (citation omitted). "In dismissing an action on *forum non conveniens* grounds the court must examine: (1) whether an adequate alternative forum exists, and (2) whether the balance of private and public interest factors favors dismissal." *Id.* (citation omitted). "Once the defendant has challenged the propriety of venue in a given court, the plaintiff bears the burden of showing that venue is proper." *Autodesk, Inc. v. Kobayashi + Zedda*

---

[1] The First and Second Amendments to the MIPA incorporate by reference Section 10.10 of the MIPA. *See* ECF Nos. 21-5 at 3; 21-6 at 3.

3

*Architects Ltd.*, 191 F. Supp. 3d 1007, 1020 (N.D. Cal. 2016) (citing *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979)).

"When the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause. Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion [or a motion to dismiss on *forum non conveniens* grounds] be denied." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Texas*, 571 U.S. 49, 62 (2013). More specifically, when there is a valid forum or venue selection clause, "the plaintiff's choice of forum merits no weight," and the district court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 63–64. Accordingly, "a district court may consider arguments about public-interest factors only," and because "those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64.

## III. DISCUSSION

The parties' dispute boils down to whether a valid, mandatory venue selection clause exists, and if so, whether that clause applies to the claims at issue in this case. The Court concludes that the answer to both questions is yes.

First, the two relevant venue selection clauses—Section 10.10 of the MIPA and Paragraph 7 of the Release—when read together require that relevant litigation be brought in Sonoma County Superior Court.[2] Section 10.10 of the MIPA provides: "If any dispute arises under this Agreement, the parties shall first use their best efforts to reach agreement on the matters in dispute under the terms herein. If such efforts do not resolve the dispute, either Party may commence litigation in Superior Court, County of Sonoma." While Plaintiffs argue that the word "may" signifies a permissive venue selection clause, the Court finds that a more natural reading is that

---

[2] Plaintiffs contend that there are actually seven sections within the relevant agreements that govern forum and/or venue. ECF No. 41 at 8. With the exception of the two clauses the Court has identified and the two amendments that merely reincorporate Section 10.10 of the MIPA, the Court disagrees that the other sections affect the venue analysis. Those remaining three sections merely include language referring to determinations or enforcements by "any court." *See* ECF No. 41 at 12. Those passing mentions do not bear on the parties' agreements regarding venue, and the Court is unpersuaded by Plaintiffs' assertion that the "any court" language must imply the availability of multiple forums for litigation.

4

"may" modifies the phrase "commence litigation" rather than indicating where such litigation could be brought. Indeed, the preceding sentence emphasizes that the parties "shall first use their best efforts to reach agreement on the matters in dispute." Only then "may" either party commence litigation, and, if such litigation is commenced, it must be in Sonoma Superior Court. This interpretation gives meaning to each part of Section 10.10 and allows the section to be read consistently with Paragraph 7 of the Release, which similarly provides: "If any civil action is filed to enforce or interpret any of the terms or provisions of this Agreement, or otherwise, the Parties agree that the appropriate venue shall be a state court of competent jurisdiction located in the County of Sonoma, State of California." And both clauses contemplate a state court in Sonoma County as the venue of any relevant litigation, so requiring the parties to litigate in Sonoma Count Superior Court would avoid any potential conflict between the two clauses. *Cf. PQ Labs, Inc. v. Yang Qi*, No. C 12-0450 CW, 2012 WL 2061527, at *13 (N.D. Cal. June 7, 2012); *Minghong Inv., Inc. v. Felix Chac Chuo*, No. 2:21-CV-05979-SB-PD, 2022 WL 2189365, at *3 (C.D. Cal. Mar. 9, 2022); *Granite Re, Inc. v. N. Lines Contracting, Inc.*, 478 F. Supp. 3d 772, 779 (D. Minn. 2020).

Second, the Court finds that Plaintiffs' claims in this case fall within the scope of the venue selection clauses. While the MIPA clause applies to disputes "aris[ing] under the Agreement" and the Release clause applies to "any civil action [] filed to enforce or interpret any of the terms or provisions of this Agreement, or otherwise," the claims here fall within the boundaries of either standard—as they are claims to enforce the rights defined and created by the two agreements.

As the FAC itself emphasizes, this case is rooted in MRW's acquisition of Phoenix, "including all of the business' goodwill and intellectual property, from Hughes for $12.5 million. [And where,] [a]s part of the sale, Hughes entered into a noncompete." ECF No. 21 ¶ 3; *see also id.* ¶14 ("Hughes was the former owner of Phoenix. In selling Phoenix (including Phoenix's goodwill and trademarks) to MRW, Hughes entered into a written non-compete. Hughes' The Négociant activities violate this non-compete."). Critically, the acquisition was accomplished through, and defined by, the MIPA and Release. *See id.* ¶ 48. ("In January and September 2023, and in two tranches, Hughes sold the de Négoce business, including goodwill, label, brand, trademarks, and all intellectual property to MRW. . . . In the first sales transaction in January

5

2023, MRW acquired a 51% controlling interest in de Négoce (Phoenix) [citing MIPA] . . . . As of September 2023, MRW acquired the remaining 49% of de Négoce (Phoenix) for an additional $2.5 million payment [citing Release].").

In sum, Plaintiffs bring this action to enforce the rights they acquired in the purchase of Phoenix and its associated goodwill and intellectual property, as conveyed through the MIPA and Release. *See id.* ¶¶ 5 ("Hughes violated the non-compete. More brazen, he (and his new company, Defendant The Négociant) did so using a product name that clearly trades on the goodwill of the brand he just sold, infringing Phoenix's federally registered trademarks."). In other words, whether Hughes's operation of The Negociant is actionable depends first on the scope of the assets sold and the restrictions imposed by those very agreements.

The breach of contract claim directly enforces the terms of the MIPA and the Release, as Plaintiffs allege that Hughes violated the MIPA's non-compete covenant (as amended by the Release) and the Release's non-disparagement clause. *See id.* ¶¶ 53, 58, 63, 72–73. Resolution of the breach of contract claim will thus necessarily require interpretation of the terms of those agreements, including the scope of the non-compete and relevant carveout added by the Release.

Similarly, the trademark-based claims arise under and are framed by the purchase agreements, even though those claims sound in statutory and common law. *See Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 2009 WL 4730825, at *5 (E.D. Wis. Dec. 7, 2009) ("While Versatile is correct to note that it alleges claims not rooted in contract but deriving from federal statutes, state statutes, and its common law rights, the Court cannot turn a blind eye to the contractual setting in which its claims arose." (citing *Kochert v. Adagen Medical Intern., Inc.,* 491 F.3d 674, 680 (7th Cir. 2007))). Plaintiffs allege that MRW acquired the de Négoce "trademarks[] and all intellectual property" as part of the Phoenix purchase and that Hughes's subsequent conduct allegedly infringes those purchased rights, undermining the value of the assets conveyed. Thus, the gravamen of the trademark claims is that Hughes failed to honor his counterparty's rights in the assets he sold—trademark rights and goodwill—thereby frustrating the purchase agreement itself. *See* ECF No. 21 ¶ 6 ("If Hughes wanted to own de Négoce, he should not have sold it. Yet he did, happily pocketing $12.5 million."). Accordingly, the

trademark claims fall within the scope of the relevant venue provisions because they "arise under" the MIPA terms pertaining to the acquisition of Phoenix's trademarks and intellectual property and are an attempt to "enforce or interpret" those same terms in the Release. *See Phoong L. Corp. v. Primary Wave Media, LLC*, No. 2:25-CV-00840-JLS-AGR, 2025 WL 2087557, at *4 (C.D. Cal. June 6, 2025) (finding that the claims for "fraud in the inducement, conspiracy to defraud, trademark infringement, federal unfair competition, California unfair competition, and intentional interference with prospective business relations also squarely fit within the scope of the forum-selection clause" because each of the claims "relates in some way to rights and duties set out in the Primary Wave Agreements, and cannot be decided without reference to those contracts").

The same is true for Plaintiffs' other tort-based claims. *See* ECF No. 21 ¶¶ 181 (asserting unfair competition based on the allegation that "Defendants have palmed off their goods and services as those of Phoenix, improperly trading upon Phoenix's goodwill and valuable rights in and to the DE NÉGOCE Marks."); 198 (asserting an intentional interference with contractual relations claim based on MRW's "pre-existing business relationships with new customers of the negociantwine.com website").

Lastly, the Court's conclusion regarding the scope of the venue selection clauses is reinforced by inclusion of the phrase "or otherwise" in Paragraph 7 of the Release. The most common-sense interpretation of this phrase, and therefore the one most likely to give effect to the intent of the parties, is that "or otherwise" describes the claims subject to the venue provision—in other words, if *any* civil action is filed, whether to "enforce or interpret" the Agreement *or otherwise*, that action must be brought in the Sonoma Superior Court. *See generally Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459, 469, 834 P.2d 1148, 1154 (1992) ("We seriously doubt that any rational businessperson, attempting to provide by contract for an efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship.").

Accordingly, the Court concludes that the venue selection clauses in Section 10.10 of the

1  MIPA and Paragraph 7 of the Release are valid, mandatory, and applicable to the claims at hand.

2  Defendants' motion to dismiss is therefore granted without leave to amend.  *See Sadiq v. Metro.*

3  *Coffee Co.*, No. 21-CV-00747-JST, 2021 WL 4499234, at *3 (N.D. Cal. July 12, 2021).

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss for forum non conveniens.  The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated:  September 12, 2025



_____
JON S. TIGAR
United States District Judge